**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 27, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UTE MOUNTAIN UTE TRIBE,

        Plaintiff-Appellee,

v.

DOROTHY RODRIGUEZ, Secretary,
Taxation and Revenue Department for the
State of New Mexico,

        Defendant-Appellant.

_____

NEW MEXICO OIL & GAS
ASSOCIATION; COUNCIL OF
ENERGY RESOURCE TRIBES,

        Amici Curiae.

No. 09-2276

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 1:07-CV-00772-JAP-WDS)**

---

John B. Pound of Long, Pound & Komer, P.A., Santa Fe, New Mexico, for Defendant-Appellant.

Daniel H. Israel, Boulder, Colorado (Peter J. Ortego, Ute Mountain Ute Tribe Justice Department, Towaoc, Colorado; Timothy A. Vollmann, Albuquerque, New Mexico, with him on the brief), for Plaintiff-Appellee.

Troy A. Eid and Jennifer H. Weddle of Greenberg Traurig, LLP, Denver, Colorado, filed an amicus curiae brief for the New Mexico Oil and Gas Association and the Council of Energy Resource Tribes.

Before **BRISCOE**, Chief Judge, **LUCERO**, and **HOLMES**, Circuit Judges.

**HOLMES**, Circuit Judge.

## INTRODUCTION

In this case, we must resolve the issue of whether federal law preempts five state taxes imposed on non-Indian lessees extracting oil and gas from the Ute Mountain Ute Reservation ("Ute Reservation") in New Mexico.  The district court, finding in favor of Plaintiff-Appellee Ute Mountain Ute Tribe ("Ute Tribe" or "Tribe"), held that the five state taxes were preempted by federal law and enjoined the State of New Mexico from further imposing the taxes on the non-Indian lessees operating on the Ute Reservation. The Secretary of the New Mexico Taxation and Revenue Department, Dorothy Rodriguez ("the State"), now appeals from that adverse judgment.[1]

On appeal, the State argues, *inter alia*, that the district court misinterpreted and misapplied Supreme Court precedent.  Specifically, the State asserts that the five New Mexico state taxes are valid and enforceable under the Supreme Court case *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163 (1998), and therefore asks this court to

---

[1]    At the outset of this litigation, Rick Homans was the Secretary of the New Mexico Taxation and Revenue Department.  The State's counsel informed us on September 3, 2010, that Mr. Homans no longer holds this position.  His replacement is Dorothy Rodriguez.  Therefore, pursuant to Federal Rule of Appellate Procedure 43(c)(2), we order the substitution of Ms. Rodriguez in the place of Mr. Homans.

reverse the district court's judgment and vacate the injunction. Exercising jurisdiction

pursuant to 28 U.S.C. § 1291, we reverse the district court's judgment and remand the

case for further proceedings not inconsistent with this opinion.

## BACKGROUND[2]

The Ute Tribe is a federally recognized Indian Tribe with approximately 2000

enrolled members. The Ute Reservation—which is located in the States of New Mexico,

Utah, and Colorado—was first established by treaty in 1868.[3] The initial Ute Reservation

was reduced in size by two subsequent acts of Congress.[4] The Reservation is therefore

both a treaty and a statutory reservation, rather than an executive reservation established

by executive order. The federal government holds the Reservation in trust for the benefit

of the Ute Tribe. The majority of the Ute Reservation lies within the State of Colorado;

only a small portion lies within New Mexico's borders. The portion of the Reservation

located in New Mexico is unalloted and uninhabited, and the only activities that occur on

---

[2]     This background section is largely drawn from the 311 factual findings set out in the district court's October 2, 2009 Memorandum Opinion. On appeal, the parties do not specifically contest any of the district court's factual findings; rather, they dispute the legal conclusions that should be drawn from those facts.

[3]     *See* Treaty Between the United States of America and the Tabeguache, Muache, Capote, Weeminuche, Yampa, Grand River, and Uintah Bands of Ute Indians, 15 Stat. 619 (Mar. 2, 1868).

[4]     *See* Act of Apr. 29, 1874, ch. 136, 18 Stat. 37; Act of June 15, 1880, ch. 223, 21 Stat. 199.

that portion of the Reservation are grazing and the extraction of mineral resources.[5]

Although there are some unpaved roads on the Tribe's land, there are no state-regulated or state-maintained roads or other infrastructure within the Reservation.

The Ute Tribe is authorized by federal law, subject to approval by the Secretary of the Interior, to enter into oil and gas leases and development agreements on the Reservation.[6] The Tribe began entering into mineral leases with oil and gas operators on the Reservation in the 1950s. Authority to execute mineral leases is granted by the Indian Mineral Leasing Act of 1938 ("IMLA"), ch. 198, 52 Stat. 347 (codified at 25 U.S.C. §§ 396a–396g).[7] Authority to execute mineral development agreements is authorized by the Indian Mineral Development Act of 1982 ("IMDA"), Pub. L. No. 97-382, 96 Stat. 1938 (codified at 25 U.S.C. §§ 2101–08).[8]

There are 186 active oil and gas wells on the Ute Reservation, which are operated

---

[5]     Subsequent references to the "Ute Reservation" or "Reservation" refer solely to the portion of the tribal lands located in New Mexico.

[6]     The Secretary has delegated the authority to approve leases and agreements to the Bureau of Indian Affairs ("BIA").

[7]     The IMLA has been implemented through comprehensive regulations promulgated by the Secretary of the Interior. *See, e.g.*, 25 C.F.R. pt. 211 (regulating the "[l]easing of [t]ribal [l]ands for [m]ineral [d]evelopment"); 30 C.F.R. pt. 202 (regulating mineral resource royalties); 43 C.F.R. pt. 3160 (regulating "[o]nshore [o]il and [g]as [o]perations").

[8]     The IMDA has likewise been implemented through comprehensive regulations promulgated by the Secretary of the Interior. *See, e.g.*, 25 C.F.R. pt. 225 (regulating "[o]il and [g]as, [g]eothermal, and [s]olid [m]inerals [a]greements" on Indian land); 30 C.F.R. pt. 202 (regulating mineral resource royalties); 43 C.F.R. pt. 3160 (regulating "[o]nshore [o]il and [g]as [o]perations").

under existing leases and agreements by twelve different oil and gas companies. Natural gas is the primary resource extracted from the wells, with oil being the secondary resource. Most, if not all, of the existing leases between the Ute Tribe and the twelve lessees were executed under the IMLA. In fact, the district court identified no leases, and only three development agreements, executed under the IMDA.[9] The mineral resources severed from the Ute Reservation are extracted from several oil and gas pools located beneath the Reservation. These oil and gas pools were established in the 1940s and 1950s by the Oil and Conservation Division of the New Mexico Energy, Minerals, and Natural Resources Department ("NMOCD"), which is the state entity responsible for the regulation of oil and gas operations in New Mexico. Apart from defining and establishing the oil and gas pools, NMOCD also sets well spacing and well setbacks in the State, among a wide variety of other functions.

The federal statutory and regulatory scheme governing oil and gas operations on Indian land covers virtually every aspect of such operations on the Ute Reservation. *See* 25 C.F.R. pt. 211 (governing "[l]easing of [t]ribal [l]ands for [m]ineral [d]evelopment"); 25 C.F.R. pt. 224 (governing "[t]ribal [e]nergy [r]esource [a]greements"); 25 C.F.R. pt. 225 (governing "mineral agreements for the development of Indian-owned minerals entered into pursuant to the [IMDA]"); 30 C.F.R. §§ 1202.550–.558 (governing royalties on gas production from Indian leases); 30 C.F.R. §§ 1206.50–.62 (governing product

---

[9] Those development agreements are between the Ute Tribe and Elk San Juan, Inc., BIYA Operators, Inc., and Texakoma Oil and Gas Corp.

5

valuation for mineral resources produced from Indian oil and gas leases); 43 C.F.R. pt.

3160 (governing onshore oil and gas operations, which are overseen by the Bureau of

Land Management ("BLM")).[10]

However, the role of NMOCD is not entirely nonexistent when it comes to oil and

gas operations on the Ute Reservation.  The federal government and NMOCD have a

cooperative regulatory relationship when it comes to at least setting well spacing and well

---

[10]     The district court described the federal regulatory scheme in the following manner:

> For unallotted lands, such as the [Ute] Reservation, the [BIA] has implemented the IMLA in a set of regulations at 25 C.F.R. Part 211.  For the IMDA, the BIA's implementing regulations are at 25 C.F.R. Part 225.  The bulk of the regulations are concerned with leases and agreements themselves, an area NMOCD does not purport to regulate on the New Mexico lands.  For the area that NMOCD does purport to regulate—oil and gas operations—the BIA has adopted BLM regulations and has given BLM authority to enforce them.  25 C.F.R. §§ 211.4 (IMLA leases), 225.4 (IMDA agreements).  The BLM regulations, codified at 43 C.F.R. Part 3160, apply to all oil and gas operations on both federal public lands and tribal lands.  43 C.F.R. § 3161.1(a).  Generally speaking, the BLM has authority to do, among other actions, the following: 1) "to approve, inspect and regulate" oil and gas operations; 2) "to require compliance . . . with the regulations" in Title 43; 3) "to require . . . protect[ion] of other natural resources and the environmental quality"; 4) to require "protect[ion] of life and property"; 5) to ensure "the maximum ultimate recovery of oil and gas with minimum waste"; 6) "to enter into cooperative agreements with States [] and Indian tribes relative to oil and gas development and operations"; and 7) to "issue written and oral orders to govern specific lease operations." *Id.* § 3161.2.

R. at 228–29 (third, fourth, and fifth alterations in original)  (Dist. Ct. Op., dated Oct. 2, 2009).  We do not disagree with this characterization.

setbacks on the Reservation.  More specifically, as the district court noted in its opinion, "the BLM adopted the NMOCD standards for well spacing and setbacks as the standards for Indian lands," including the Ute Reservation, and "also used the NMOCD hearing process for notification and participation in decisions on well spacing matters on Indian lands, including setting of spacing, approval of non-standard well locations, approval of non-standard spacing units, and forced pooling."  R. at 193.  After the NMOCD conducted a hearing regarding one of the aforementioned categories (e.g., setting of well spacing or approval of a non-standard well location), NMOCD would issue a draft order that the BLM would generally adopt as a final order.  NMOCD also established the oil and gas pools underlying the Ute Reservation from which the mineral resources are severed.  Furthermore, apart from the cooperative regulatory relationship regarding well spacing and setbacks, and the establishment of the oil and gas pools, NMOCD is otherwise involved—although minimally—with the operations that take place on the Ute Reservation.  *See, e.g.*, *id.* at 180–81 (explaining that NMOCD requires operators on the Ute Reservation to file certain forms and may revoke the operators' authority to transport resources in the State if such requirements are not met).

Once the oil and gas is severed from the tribal land, the mineral resources are transported off the reservation to be processed and sold, which is only made possible through the use of an off-reservation infrastructure.  Oil extracted from the Ute Reservation is transported by truck to refineries in New Mexico, outside of the Reservation, "on roads . . . [that] are constructed and maintained by the State of New

7

Mexico." *Id.* at 200. Natural gas extracted from the Reservation is transported to processing facilities within the State "through gathering pipelines in the [Reservation] to main lines in New Mexico." *Id.* at 184, 201. The off-reservation infrastructure used to transport the extracted resources is regulated—and in the case of roads, provided and maintained—by the State of New Mexico. *See, e.g.*, Pipeline Safety Act, N.M. Stat. Ann. §§ 70-3-1 to -22; Gathering Line Land Acquisition Act, N.M. Stat. Ann. §§ 70-3A-1 to 70-3A-7. "Without an off-reservation infrastructure in New Mexico to transport oil and gas," which is only made possible by the State, "the economic value of the oil and gas produced on the [Ute Reservation] would be substantially less." R. at 201. The district court consequently found that "[t]he State provides substantial services by regulating the off-reservation infrastructure that makes transport of oil and gas possible." *Id.*

The State also makes available to the non-Indian oil and gas operators some on-reservation services, including "a hearing process for resolving disputes between operators, publicly available geologic records, publicly available production records, and records of sales and transfers," all of which the trial court found were rarely, if ever, utilized by the operators. *Id.* at 199–200. In addition, NMOCD offers to provide "environmental cleanup and site inspection" and the "plugging of abandoned wells" on the Reservation, but these services are likewise not used by the Tribe or operators. *Id.* at 181, 199. The non-use of these services is largely due to the fact that the Tribe "has barred NMOCD officials and employees from entering the [Reservation] without permission" since 1992, "because the [Tribe] does not recognize the authority of

8

NMOCD over oil and gas on the [Reservation]." *Id.* at 194.[11]

The Ute Tribe generates revenue from the oil and gas operations on the Reservation through royalties and taxes. The Tribe "receives 13.1% of the wellhead value [of the oil or gas] in royalties," which are "distributed to enrolled members of the [Tribe] on a per-capita basis." *Id.* at 201. In 2007, the Tribe received almost $4.5 million in royalties. The Tribe also imposes two taxes on non-Indian operators extracting resources from the Reservation: (1) a possessory interest tax, which is "assessed at the rate of 6% of the market value of the lease or agreement," and (2) a severance tax, which is "assessed at the rate of 5% of the wellhead value of the oil or gas severed on the [Reservation] and sold or transported off the Reservation." *Id.* at 202. The net effect of the two taxes "has been, on average, a 9.5% tax on the gross wellhead value of oil and gas extracted on the [Reservation]." *Id.*

In addition to the tribal taxes, the State of New Mexico imposes five taxes on oil and gas operators working in the State, including operators extracting resources from the Ute Reservation. These five taxes are the Oil and Gas Severance Tax, N.M. Stat. Ann. § 7-29-1; the Oil and Gas Conservation Tax, *id.* § 7-30-1; the Oil and Gas Emergency School Tax, *id.* § 7-31-1; the Oil and Gas Ad Valorem Production Tax, *id.* § 7-32-1; and the Oil and Gas Production Equipment Ad Valorem Tax, *id.* § 7-34-1. These are the five

---

[11] NMOCD has abided by this policy, but there is no evidence suggesting that it agrees with the Tribe on this issue. The Tribe has, however, permitted NMOCD to enter the Reservation on a few occasions since 1992.

taxes that the Tribe challenges in the case at bar. As the district court found, the existing

leases and agreements between the oil and gas operators and the Ute Tribe "do not

directly pass the cost of the five New Mexico taxes on to the [Tribe]"; the oil and gas

operators pay the taxes. *Id.* at 203.[12]

In 1992, the Ute Tribe passed Resolution No. 3874, which dictates that "in the

event the five New Mexico taxes are found unlawful, the [Tribe's] severance tax will be

increased by the amount of the five New Mexico taxes." *Id.* at 203; *see also* Ute

Mountain Ute Tribal Council Resolution No. 3874 (Feb. 13, 1992). The money collected

from this increased severance tax would go to the Tribe and its members. Specifically,

the district court found that if the state taxes were removed and the Resolution was

implemented, the Tribe "would receive at least $1,300,000 per year in additional revenue

from the severance tax, an increase of approximately $650 per enrolled [tribal] member

per year." *Id.* at 204. The district court also found that if the taxes were found unlawful,

---

[12]     To alleviate the economic burden of these taxes, the State offers two tax credits to operators subject to the five state taxes: the Intergovernmental Production Tax Credit and the Intergovernmental Production Equipment Tax Credit, which only apply to wells drilled after July 1, 1995. *See* N.M. Stat. Ann. § 7-29C-1. "The net effect of the New Mexico tax credits has been an average reduction (over years 1999–2007) of approximately 1.14% in the yearly aggregate tax rate of the five New Mexico taxes on operators extracting oil and gas on the [Reservation]"; however, "the reduction is increasing as new wells come into production and old wells are shut down." R. at 198. In the event that the Tribe decides to increase tribal taxation on operators extracting resources from the Reservation, the Intergovernmental Production Tax Credit (but not the Intergovernmental Production Equipment Tax Credit) offered by the State will be reduced by the amount of the tribal tax increase on wells drilled on or after July 1, 1995. *See* N.M. Stat. Ann. § 7-29C-1(F).

10

but the Resolution was rescinded or otherwise not implemented, then "oil and gas production on the [Ute Reservation] would become more attractive to oil and gas operators relative to oil and gas production elsewhere in New Mexico," which would in turn lead to increased production and increased revenues for the Tribe. *Id.* at 205. However, regardless of whether the five state taxes are enforced and regardless of whether the Resolution is ever implemented, the Ute Tribe nevertheless "has the authority to increase severance taxes on existing leases and agreements it has entered into with operators, or to enact a third [tribal] tax." *Id.* at 203 (citing *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982)).[13] Furthermore, the district court found—and the parties do not dispute—that "[t]here is no record evidence that the imposition of the five New Mexico taxes substantially interferes with the [Tribe's] ability to govern itself." *Id.* at 206.

On August 10, 2007, the Tribe filed a complaint in district court challenging the

---

[13] Of course, if an existing lease or agreement prohibited an increase in taxes, or placed a cap on the percentage of revenues, that general authority to increase existing taxes or enact a third tax would be limited. "The only leases or agreements under which the [Ute Tribe] has surrendered—at least to an extent—its authority to increase severance taxes are the recent [development] agreements that cap [tribal] revenues at 30%." *Id.* at 203. However, the "revenues in those agreements are currently substantially below 30% and an increase of [tribal] revenue to 30% would be significant." *Id.* at 204. In other words, those caps do not present a real impediment to the Tribe's ability to raise taxes under those agreements. In any event, the district court only identified a total of three development agreements that the Tribe had entered into, only one of which included a 30% cap. Furthermore, the "revenue from development agreements, including those agreements which cap [tribal] revenue at 30%, is not a substantial part of [the Tribe's] revenue from oil and gas development"; "[t]he much greater part of [the Tribe's] revenue comes from leases without any cap on [tribal] revenues." *Id.* at 204.

11

five New Mexico taxes. The Tribe asserted that: (1) "the imposition of the state taxes violates federal common law, the federal right of the [Tribe] to self-determination, and the Supremacy Clause"; and (2) the imposition of the ad valorem property tax on oil and gas production equipment "violates the Fourteenth Amendment and the Enabling Act of June 20, 1910," in which the State "disclaimed any taxing jurisdiction over lands held by the United States of America for the benefit of tribes." *Id.* at 173.[14] After trial, in a memorandum opinion, the district court held that the five New Mexico taxes were preempted by federal law. The district court based this holding on several conclusions, including that "there is a significant backdrop of tribal sovereignty" in this case; that the State has "minimal" involvement in the oil and gas operations on the Reservation; that "the economic burden falls heavily on the Tribe," rather than the non-Indian lessees; and that the State of New Mexico did not "regulate[] oil and gas operations on the [Reservation]." *Id.* at 234. The district court subsequently entered judgment in favor of the Ute Tribe "(1) declaring that [the State had] been acting in violation of federal laws by the imposition of the[] [five] taxes, and (2) permanently enjoining [the State] from henceforth imposing the five state taxes at issue in this case." *Id.* at 235 (Trial Ct. J., dated Oct. 30, 2009). The State timely appealed the district court's judgment.

---

[14] The Ute Tribe brought a third challenge under 42 U.S.C. § 1983, which was dismissed by the district court, along with a related request for costs and attorneys' fees. Those rulings are not before us.

12

## DISCUSSION

The Ute Tribe challenges the five New Mexico taxes at issue on the grounds that they are preempted by federal law and that they interfere with the Tribe's right of self-governance. The same five New Mexico taxes at issue in this appeal were also challenged in *Cotton Petroleum*, where the taxes were upheld. In that case, the Supreme Court applied a flexible preemption analysis unique to federal Indian law, which was first articulated in *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980), and further established in *Ramah Navajo School Board, Inc. v. Bureau of Revenue of New Mexico*, 458 U.S. 832 (1982). The district court applied the same preemption analysis in the present case. On appeal, the State argues that the district court misinterpreted and misapplied the applicable Supreme Court case law, and that the outcome of this case is controlled by *Cotton Petroleum*—that is, the State argues that this case cannot be materially distinguished from *Cotton Petroleum* and therefore the taxes should be deemed lawful and enforceable, just as they were in that case. Applying the "flexible preemption analysis" developed by the Supreme Court in *Bracker*, *Ramah*, and *Cotton Petroleum*, we must resolve whether the five New Mexico taxes at issue are preempted by federal law.

## I.     Standard of Review

On appeal, "[w]e review the district court's preemption determination de novo." *Ramsey Winch Inc. v. Henry*, 555 F.3d 1199, 1204 (10th Cir. 2009). We review the district court's underlying factual findings for "clear error." *Green v. Haskell Cnty. Bd. of Comm'rs*, 568 F.3d 784, 795 (10th Cir. 2009), *cert. denied*, 130 S. Ct. 1687 (2010). Clear

13

error exists "only if a finding is wholly without factual support in the record, or after reviewing the evidence, we are definitively and firmly convinced that a mistake has been made." *United States v. Ivory*, 532 F.3d 1095, 1103 (10th Cir. 2008) (quoting *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1130 (10th Cir. 2006)) (internal quotation marks omitted). However, neither party challenges the district court's specific factual findings on appeal. *See supra* note 2.

## II. Federal Indian-law Preemption Doctrine

"[T]here is no rigid rule by which to resolve the question whether a particular state law may be applied to an Indian reservation or to tribal members." *Bracker*, 448 U.S. at 142. The Supreme Court has identified "two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members"—preemption by federal law and tribal sovereignty. *Id.*; *see also Ramah*, 458 U.S. at 837. As the Supreme Court explained in *Ramah*:

> The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members. They are related, however, in two important ways. The right of tribal self-government is ultimately dependent on and subject to the broad power of Congress. Even so, traditional notions of Indian self-government are so deeply engrained in our jurisprudence that they have provided an important back-drop, . . . against which vague or ambiguous federal enactments must always be measured.

458 U.S. at 837 (quoting *Bracker*, 448 U.S. at 143) (internal quotation marks omitted). Therefore, "[a]lthough determining whether federal legislation has pre-empted state taxation of lessees of Indian land is primarily an exercise in examining congressional

14

intent, the history of tribal sovereignty serves as a necessary 'backdrop' to that process." *Cotton Petroleum*, 490 U.S. at 176 (citing *Rice v. Rehner*, 463 U.S. 713, 719 (1983)).

In this particular context, Supreme Court jurisprudence regarding "whether a State may tax on-reservation oil production by non-Indian lessees has varied over the course of the past century." *Cotton Petroleum*, 490 U.S. at 173. "At one time, such a tax was held invalid unless expressly authorized by Congress; more recently, such taxes have been upheld unless expressly or impliedly prohibited by Congress." *Id.* Under the current doctrine, when determining whether a state has authority to impose a nondiscriminatory tax on non-Indian lessees operating on Indian lands, the court must undertake a preemption analysis that is unique to this area of the law. *See, e.g*, *Ramah*, 458 U.S. at 838 (stating that "[t]he question [of] whether federal law . . . pre-empts the State's exercise of its regulatory authority [in this area] is not controlled by standards of pre-emption developed in other areas" (citing *Bracker*, 448 U.S. at 143–44)). This analysis is "not controlled by 'mechanical or absolute conceptions of state or tribal sovereignty.'" *Cotton Petroleum*, 490 U.S. at 176 (quoting *Bracker*, 448 U.S. at 145). Instead, courts are instructed to "appl[y] a flexible pre-emption analysis sensitive to the particular facts and legislation involved." *Id.* This fact-specific examination requires a reviewing court to undertake a "particularized inquiry into the nature of the state, federal, and tribal interests at stake," which is "designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *Bracker*, 448 U.S. at 145. Moreover, as alluded to above, when making this inquiry the court must be "cognizant of

15

both the broad policies that underlie the legislation and the history of tribal independence in the field at issue." *Cotton Petroleum*, 490 U.S. at 176; *see also Ramah*, 458 U.S. at 838 ("[T]he traditional notions of tribal sovereignty, and the recognition and encouragement of this sovereignty in congressional Acts promoting tribal independence and economic development, inform the pre-emption analysis that governs this inquiry."). Under this balancing test, "[s]tate jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the State interests at stake are sufficient to justify the assertion of State authority." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334 (1983) (citing *Bracker*, 448 U.S. at 145; *Ramah*, 458 U.S. at 846).

The "particularized inquiry" we are instructed to employ is better understood as it has been applied by the Supreme Court in *Bracker*, *Ramah*, and *Cotton Petroleum*. At the outset, it is important to point out the three primary factors the Supreme Court has focused on when applying this flexible preemption analysis: (1) the extent of the federal and tribal regulations governing the taxed activity; (2) whether the "economic burden" of the tax falls on the tribe or the non-Indian individual or entity; and (3) the extent of the state interest justifying the imposition of the taxes.[15]

In *Bracker*, the Supreme Court addressed a challenge to Arizona's motor carrier

---

[15] The district court in this case correctly identified these three factors as the ones uniformly analyzed by the Supreme Court in *Bracker*, *Ramah*, and *Cotton Petroleum*.

16

license and use fuel taxes as applied to a non-Indian logging company's use of roads located solely on tribal land. 448 U.S. at 139–40. The Court assessed the "state, federal, and tribal interests at stake," and concluded that the Arizona state taxes were preempted by federal law. *Id.* at 145–51. In evaluating the federal interest, the Court found "that the federal regulatory scheme [was] so pervasive as to preclude the additional burdens sought to be imposed in th[at] case." *Id.* at 148. It found that the "assessment of [the] state taxes would obstruct federal policies," including the federal objective "that the Tribe should retain the benefits derived from the harvesting and sale of reservation timber." *Id.* at 148–49. As to the state interest involved, the Court deemed it "equally important" that the respondents were "unable to identify any regulatory function or service performed by the State that would justify the assessment of taxes for activities on Bureau and tribal roads within the reservation." *Id.* at 148–49. That is, the Court was not "able to identify a legitimate regulatory interest served by the taxes" other than "a general desire to raise revenue." *Id.* at 150. Furthermore, because the "Tribe agreed to reimburse [the company] for any tax liability incurred as a result of its on-reservation business activities," including the Arizona taxes at issue, it was "undisputed that the economic burden of the asserted taxes [would] ultimately fall on the Tribe." *Id.* at 140, 151; *see also id.* at 150 (stating that "this is not a case in which the State seeks to assess taxes in return for governmental functions it performs *for those on whom the taxes fall*" (emphasis

17

added)).[16]  In light of the "pervasive" federal scheme of regulation, the unquestionable incidence of the economic burden on the tribe, and the lack of any identified regulatory function or service performed by the state, the Court concluded that the Arizona taxes were preempted by federal law.  *See id.* at 151 ("Where, as here, the Federal Government has undertaken comprehensive regulation of the harvesting and sale of tribal timber, where a number of the policies underlying the federal regulatory scheme are threatened by the taxes respondents seek to impose, and where respondents are unable to justify the taxes except in terms of a generalized interest in raising revenue, we believe that the proposed exercise of state authority is impermissible.").

In *Ramah*, the State of New Mexico sought to impose a tax on two non-Indian construction companies hired by the tribe to build a school on the reservation.  In reviewing a challenge to the tax, the Court "address[ed] the question [of] whether federal law pre-empts a state tax imposed on the gross receipts that a non-Indian construction company receives from a tribal school board for the construction of a school for Indian children on the reservation." *Ramah*, 458 U.S. at 834.  In that case, although the construction company initially paid the state tax, the company "was reimbursed by the [tribe] for the full amount paid"; therefore, as in *Bracker*, the economic burden of the tax fell on the tribe.  *Id.* at 835; *see also Cotton Petroleum*, 490 U.S. at 184 ("Also as in

---

[16]  The Court noted, however, that "the fact that the economic burden of the tax falls on the Tribe does not by itself mean that the tax is pre-empted." *Bracker*, 448 U.S. at 151 n.15 (citing *Moe v. Salish & Kootenai Tribes*, 425 U.S. 463 (1976)).

18

*Bracker*, the economic burden of the tax [challenged in *Ramah*] ultimately fell on the Tribe.").

Looking to the federal interest—that is, the extent of the federal scheme—the Court observed that the "[f]ederal regulation of the construction and financing of Indian educational facilities [was] both comprehensive and pervasive," *Ramah*, 458 U.S. at 839, which "left the State with no duties or responsibilities" when it came to the education of Indian children, *id.* at 843 (quoting *Warren Trading Post Co. v. Ariz. Tax Comm'n*, 380 U.S. 685, 691 (1965)) (internal quotation marks omitted). The existence of this "comprehensive and pervasive" federal scheme, and corresponding lack of any identified state role, left "no room for the additional burden sought to be imposed by the State through its taxation of the gross receipts." *Id.* at 842. The state was otherwise unable to identify "any specific, legitimate regulatory interest to justify the imposition of its gross receipts tax." *Id.* at 843. The state argued that the services provided to the company for its activities off the reservation were significant enough to justify the tax, but the Court rejected this argument:

> The only arguably specific interest advanced by the State is that it provides services to *Lembke* [the non-Indian construction company] for its activities *off the reservation*. This interest, however, is not a legitimate justification for a tax whose ultimate burden falls on the tribal organization. Furthermore, although the State may confer substantial benefits on Lembke as a state contractor, we fail to see how

19

these benefits can justify a tax imposed on the construction of school facilities *on tribal lands* pursuant to a contract between the tribal organization and the non-Indian contracting firm.

*Id.* at 843–44 (footnote omitted).[17] In the end, "[t]he State's ultimate justification . . . amount[ed] to nothing more than a general desire to increase revenues," which the Court found—as it did in *Bracker*—was "insufficient to justify the additional burdens imposed by the tax on the comprehensive federal scheme regulating the creation and maintenance of educational opportunities for Indian children and on the express federal policy of encouraging Indian self-sufficiency in the area of education." *Id.* at 845. Having considered each of these factors, the Court concluded that the case was analogous to *Bracker*, and therefore that the state tax was preempted by federal law. *Id.* at 839.

In *Cotton Petroleum*, which is most important for our purposes, the Court considered a challenge to the same five taxes at issue in the present appeal, brought by a non-Indian lessee conducting oil and gas operations on the Jicarilla Apache Reservation in New Mexico, which was an *executive* reservation.[18] Applying the analytical principles articulated in *Bracker*, and further developed in *Ramah*, the Court concluded that the five New Mexico taxes were not preempted by federal law. In reaching this conclusion, the Court first looked to the relevant federal legislation—the IMLA—and found that the Act

---

[17] The Court presumed that "the state tax revenues derived from [the contractor's] off-reservation business activities [would be] adequate to reimburse the State for the services it provide[d] to [the contractor]." *Ramah*, 458 U.S. at 844 n.9.

[18] Although the Indian tribe was not a party to the suit, it sought and was granted leave to file a brief *amicus curiae*. *Cotton Petroleum*, 490 U.S. at 170.

20

"neither expressly permits state taxation nor expressly precludes it." *Cotton Petroleum*, 490 U.S. at 177. The Court "agree[d] that a purpose of the [IMLA] is to provide Indian tribes with badly needed revenue, but f[ound] no evidence for the further supposition that Congress intended to remove all barriers to profit maximization" through the Act. *Id.* at 180; *see also id.* at 180–83 (rejecting Cotton Petroleum's argument that the IMLA impliedly prohibited state taxation of oil and gas operations on Indian land by non-Indians, and stating that the Act was "fully consistent with an intent to permit state taxation of nonmember lessees").

Next, the Court examined the history of tribal independence in the area of oil and gas leasing on Indian land. *Id.* at 181–82. "[A]t least as to Executive Order reservations," it concluded, "state taxation of nonmember oil and gas lessees was the norm from the very start," and therefore there was "no history of tribal independence from state taxation of the lessees to form a 'backdrop' against which the [IMLA] must be read." *Id.* at 182.[19]

The Court then analyzed the state, federal, and tribal interests at stake, focusing on

---

[19] Oil and gas leasing on *executive* reservations, such as the Jicarilla Apache Reservation, was first authorized by the Indian Oil Act of 1927 ("1927 Act"), ch. 299, 44 Stat. 1347 (codified at 25 U.S.C. § 398a), which also waived immunity from state taxation of oil and gas lessees operating on those reservations. Because Congress had simultaneously authorized oil and gas leases on executive reservations and waived immunity from taxation of oil and gas lessees operating on such reservations, the Supreme Court found that there was no history of tribal independence in that instance. *Cotton*, 490 U.S. at 182. However, because the Ute Reservation is a treaty and statutory reservation, the Court's conclusion that there was "no history of tribal independence from state taxation of the lessees [on executive reservations]," *id.*, is not controlling here.

21

the same factors that had been highlighted in *Bracker* and *Ramah*—the extent of the federal regulatory scheme, the economic burden, and the services and functions of the State justifying the taxes.[20]   In considering the federal regulatory scheme, the Court concluded that the regulations were "extensive," but "not exclusive," as were the regulations in *Bracker* and *Ramah*, because the "State regulate[d] the spacing and mechanical integrity of the wells located on the reservation." *Id.* at 186.[21]  As to the State's interest, the Court found that the State had a valid interest in imposing the tax because it "provide[d] substantial services to both the Jicarilla Tribe and Cotton," at a rate of approximately $3 million dollars per year. *Id.* at 185.  The Court distinguished the case from *Bracker* and *Ramah*, which "involved complete abdication or noninvolvement of the State in on-reservation activity." *Id.*  Lastly, as to the economic burden, the court acknowledged that "[n]o economic burden [fell] on the tribe by virtue of the state taxes," because the five taxes were paid by Cotton Petroleum and were not passed on to the tribe. *Id.* at 168, 185 (first alteration in original) (internal quotation marks omitted).

---

[20]    The *Cotton Petroleum* Court based its analysis largely on the factual findings made by the state district court, which had upheld the taxes. *See id.* at 185 (stating that "[t]he factual findings of the [district court] clearly distinguish this case from both [*Bracker* and *Ramah*]").

[21]    Although the majority does not elaborate on the extent of New Mexico's regulation of well spacing and mechanical integrity, Justice Blackmun does so in the dissent.  He states that "[t]he manner in which a State exercises a regulatory role in the area of well spacing indeed underscores the comprehensiveness of *federal* law in this area: state law applies not of its own force, but only if its application is approved by the [BLM].  Furthermore, additional federal spacing requirements apply to Indian lands." *Id.* at 206 n.9 (Blackmun, J., dissenting) (citing 43 C.F.R. § 3162.3-1(a) and (b) (1987)).

Furthermore, "the Tribe could, in fact, increase its taxes without adversely affecting on-reservation oil and gas development." *Id.* at 185. Accordingly, because of the stated differences between that case and *Bracker* and *Ramah*, the Court held that the five New Mexico taxes at issue here were not preempted by federal law. *Id.* at 186.

## III. Preemption Analysis

We agree with the district court, and the parties, that the preemption analysis applied by the Supreme Court in *Bracker*, *Ramah*, and *Cotton Petroleum* governs the outcome of this case. Furthermore, we note that the district court correctly "follow[ed] the sequence taken by the United States Supreme Court in *Cotton Petroleum*," looking first to the relevant legislation (i.e., the IMLA and IMDA), then considering the "historical backdrop" of relevant tribal sovereignty in the area of oil and gas leasing on Indian land, and lastly carrying out what the district court termed *"Bracker* balancing," by examining the relevant state, federal, and tribal interests and "taking into account the three factual areas deemed important by the *Cotton Petroleum* Court: the State's involvement in the activity, the economic burden of the tax, and the extent of federal and tribal regulation." R. at 224–25. Our analysis follows this same sequence.

### A. Relevant Legislation: IMLA and IMDA

In the present case, the leases and agreements entered into by the Ute Tribe were executed under the IMLA and IMDA. In *Cotton Petroleum,* the Supreme Court evaluated the IMLA under standard principles of statutory interpretation and determined that the IMLA "neither expressly permits state taxation nor expressly precludes it." 490 U.S. at

23

177; *see Montana v. Crow Tribe of Indians*, 523 U.S. 696, 714 (1998) (stating that "*Cotton Petroleum* clarified that neither the IMLA, nor any other federal law, categorically preempts state mineral severance taxes imposed, without discrimination, on *all* extraction enterprises in the State, including on-reservation operations"); *see also* R. at 218–19 ("As there was no doubt at the time of enactment of the IMLA that leases on public lands were subject to state taxation, the Supreme Court [in *Cotton Petroleum*] inferred that Congress would have understood Tribal leases to be equally subject to state taxation."). The same conclusion applies in this case—the IMLA, which governs almost all of the leases and agreements between the Ute Tribe and the oil and gas operators, does not expressly permit or expressly authorize taxation.[22]

---

[22]    In *Cotton Petroleum*, the Supreme Court also looked at several other federal statutes in pointing out the absence of any congressional intent to preempt state taxation, stating:

> Nor can a congressional intent to pre-empt state taxation be found in the Indian Reorganization Act, 48 Stat. 984, 25 U.S.C. 461 *et seq.*, the Indian Financing Act of 1974, 88 Stat. 77, 25 U.S.C. § 1451 *et seq.*, or the Indian Self-Determination and Education Assistance Act of 1975, 88 Stat. 2203, 25 U.S.C. § 450 *et seq.* Although these statutes "evidence to varying degrees a congressional concern with fostering tribal self-government and economic development," *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 155, 100 S. Ct. 2069, 2082, 65 L. Ed. 2d 10 (1980), they no more express a congressional intent to pre-empt state taxation of oil and gas lessees than does the 1938 Act. More instructive is the Crude Oil Windfall Profit Tax Act of 1980, 94 Stat. 229, 26 U.S.C. § 4986 *et seq.* In imposing the windfall profits tax, Congress expressly exempted certain Indian producers, *see* 26 U.S.C. § 4994(d), but decided not to exempt "oil received by non-Indian lessees of tribal interests." *See* S. Rep. No. 96-394, p. 61 (1979). *See also* H.R. Conf. Rep. No. 96-817, p. 108

The other relevant statute at issue in this case is the IMDA. The IMDA "was enacted to provide Indian tribes with flexibility in the development and sale of mineral resources," *Quantum Exploration, Inc. v. Clark*, 780 F.2d 1457, 1458 (9th Cir. 1986), by authorizing tribes to enter into "mineral agreements" with developers, such as joint-venture and product-sharing agreements. *See* 25 U.S.C. § 2102(a). The district court concluded that the IMDA exhibited "no Congressional intent to prohibit—or to allow—state taxation," just as the Supreme Court found with the IMLA. R. at 225. Therefore, the district court concluded that "the IMDA does not, at least in the first step of the *Cotton Petroleum* analysis, differ in any significant way from the IMLA." *Id.* at 221. On appeal, our review of the statutory language and legislative history of the IMDA does not suggest that a different conclusion is warranted. That is, we agree with the district court that nothing in the IMDA evidences a clear congressional intent to prohibit—or to authorize—the taxation of agreements executed under that Act.

The Tribe asserts that the "IMDA was a step in the direction of tribal self-determination, freeing Indian tribes from the shackles of the anachronistic statutory authorizations of the past," which it asserts "should weigh heavily in any Indian

_____

> (1980), U.S. Code Cong. & Admin. News 1980, pp. 410, 471. If Congress was of the view that taxing non-Indian lessees would interfere with the goal of promoting tribal economic self-sufficiency, it seems unlikely that it would have imposed this additional tax on those lessees.

*Cotton Petroleum*, 490 U.S. at 183 n.14. Although not the focus of our analysis here, we see no reason why the Supreme Court's analysis of these other federal acts would not apply with equal force in this case.

25

preemption analysis." Aplee. Br. at 25 n.10. However, the Tribe fails to cite any

relevant, persuasive statutory language or legislative history that evidences an express or

implied congressional intent to prohibit state taxation of agreements executed under the

IMDA.

The only mention of taxation in the legislative history of the IMDA appears in the

House Report, which states:

> In a statement submitted for the record, the governor of the State of Montana recommended an amendment[,] which would have had the effect of authorizing state taxation of the *non-Indian* portions of, or *activity under*, minerals agreement[s]. The committee declined to recommend the amendment.
>
> The Supreme Court, in recent years, has begun to illuminate this issue under existing law without difficulty. . . . If there was a need for congressional clarification of the law in this area, the committee determined that this was not the appropriate vehicle.

H.R. Rep. 97-746, at 8–9 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3465, 3470–71

(emphasis added). In other words, express authority for state taxation of "non-Indian . . .

activities under" mineral leases executed pursuant to the IMDA was put on the table;

however, the Committee refrained from including this in the Act, choosing instead to

defer to the Supreme Court's evolving jurisprudence on the topic. This statement, if

anything, evidences congressional neutrality on the issue of state taxation under the Act.

It does not, on the other hand, evidence a clear congressional intent to prohibit taxation of

activity carried out under the IMDA.

Furthermore, when the IMDA was enacted in 1982, the doctrine of

26

intergovernmental tax immunity had long been abolished, and it was well-established that non-Indian oil and gas lessees were subject to state taxation, absent clear disapproval by Congress. *See Cotton Petroleum*, 490 U.S. at 175–76, 179–80 (stating that by 1938 "oil and gas lessees operating on Indian reservations were subject to nondiscriminatory state taxation as long as Congress did not act affirmatively to pre-empt the state taxes"); *id.* (stating that "a lessee's oil production on Indian land is . . . not 'automatically exempt from state taxation,'" but "Congress does, of course, retain the power to grant such immunity" (quoting *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 150 (1973))). Had Congress intended to absolutely prohibit (or absolutely permit) state taxation under the IMDA, we think it would have been more clear in expressing such intent. Thus, we conclude that the IMDA is silent regarding the issue of taxation—that is, like the IMLA, the IMDA neither expressly prohibits nor expressly authorizes state taxation.[23]

## B.     Historical Backdrop of Tribal Sovereignty

We look next to the "historical backdrop" of relevant tribal sovereignty in the field

---

[23]     The Tribe also cites the Indian Tribal Energy Development and Self-Determination Act of 2005, 25 U.S.C. § 3501–04 (enacted as Title V of the Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat 594 (2005)), in support of its position. The general purpose of this Act is "[t]o assist Indian tribes in the development of energy resources and further the goal of Indian self-determination" through the establishment of federal programs and provision of federal grants and loans to aid tribal energy-resource-development efforts. 25 U.S.C. § 3502; *see id.* at §§ 3502–05. However, the Tribe does not cite to any statutory provision or relevant piece of legislative history regarding that Act that evidences a clear congressional intent to preempt state taxation of oil and gas lessees operating on tribal lands. Nor does this materially alter the relevant history of tribal sovereignty in the field at issue, which we discuss *infra*.

at issue—*viz.*, in the field of oil and gas leasing on treaty and statutory reservations. In *Cotton Petroleum*, the Supreme Court found that there was no history of tribal independence from taxation to serve as a "backdrop" to the analysis because, "at least as to Executive Order reservations, state taxation of nonmember oil and gas lessees was the norm from the very start." 490 U.S. at 182. The Ute Reservation, however, is a treaty and statutory reservation.

Congress first authorized mineral leasing on statutory and treaty reservations in 1891. *See* Act of Feb. 28, 1891 ("1891 Act"), ch. 383, 26 Stat. 795 (codified at 25 U.S.C. § 397). At that time, the doctrine of "intergovernmental tax immunity" was the prevailing law, under which "States were powerless to impose severance taxes on oil produced on Indian reservations unless Congress expressly waived that immunity." *Cotton Petroleum*, 490 U.S. at 181 (discussing *Gillespie v. Oklahoma*, 257 U.S. 501 (1922)). Congress acted to expressly waive that immunity in regard to oil and gas lessees on tribal lands through the Act of May 29, 1924 ("1924 Act"), ch. 210, 43 Stat. 244 (codified at 25 U.S.C. § 398), which in clear language *authorized* states to tax oil and gas operations on treaty and statutory reservations. *See* 25 U.S.C. § 398 (stating that "the production of oil and gas and other minerals on [tribal lands subject to lease for mining purposes] may be taxed by the State in which said lands are located in all respects the same as production on unrestricted lands"). Therefore, as the district court noted, oil and gas leases on treaty reservations were immune from state taxation from 1891 until 1924, more than three decades of complete independence from state taxation. *See, e.g.*, *British-Am. Oil*

28

*Producing Co. v. Bd. of Equalization of Mont.*, 299 U.S. 159, 163–66 (1936) (holding that

the State of Montana, under the explicit authority of the 1924 Act, could impose a tax on

non-Indian oil and gas lessees operating on tribal land, where the leases were entered into

under that Act).

After the 1924 Act was passed, oil and gas leases on statutory and treaty

reservations were expressly subject to state taxation; that is, in complete contrast to the

previous era of tax immunity, oil and gas operations on statutory and treaty reservations

were wholly exposed to state taxation.[24]  This era of waived immunity lasted until

1938—a period of approximately fifteen years—when Congress enacted the IMLA,

which, as discussed *supra*, "neither expressly permits state taxation nor expressly

precludes it."  *Cotton Petroleum*, 490 U.S. at 177.  As we have previously concluded,

---

[24]     The State raises the issue of whether the 1924 Act "foreclose[s] the Tribe's contention that the New Mexico taxes in question here are preempted."  Aplt. Opening Br. at 2.  In other words, the State argues that the 1924 Act may operate as an express authorization of the five state taxes at issue, thereby ending the analysis.  This argument is wholly without merit.  The 1924 Act only waived immunity for oil and gas leases executed under the 1891 Act and its 1924 amendment.  *See Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 767–68 (1985) (stating that "it is clear that if the tax proviso [in the 1924 Act] survives at all, it reaches only those leases executed under the 1891 Act and its 1924 amendment").  Because all the leases and agreements on the Ute Reservation were executed under the IMLA and IMDA, the tax provision does not apply even if it does still have any force, which we do not posit here.

The State also raises the issue of whether the Indian Oil Act of 1927, which simultaneously authorized oil and gas leases on executive reservations and waived immunity from state taxation on such leases, likewise operates to authorize the five taxes. However, this argument is equally unmeritorious.  The Oil Act of 1927 only applied to oil and gas leases on *executive* reservations, not *statutory and treaty* reservations such as the Ute Reservation, *see* 25 U.S.C. § 398(a); therefore, it is inapplicable and irrelevant.

neither the IMDA nor any other federal statute has materially altered the relevant taxation landscape since that time. Therefore, since 1938, oil and gas lessees operating on Indian reservations have been subject to nondiscriminatory state taxation, as long as Congress has not acted to expressly or impliedly preempt such taxation. *See id.* at 182–83; *see also* R. at 225 (observing that after the IMLA was enacted in 1938, "state taxation of leases was neither expressly authorized by Congress nor expressly prohibited under the Supreme Court's doctrine").

Unlike executive reservations—which had "no history of tribal independence from state taxation of [oil and gas] lessees," *Cotton Petroleum*, 490 U.S. at 182—treaty and statutory reservations were immune from state taxation from 1891 to 1924, more than three decades. The district court concluded that this "'important backdrop' of Tribal sovereignty . . . acts as a thumb on the scales in favor of the [Ute Tribe] that the United States Supreme Court in *Cotton Petroleum* did not afford the Jicarilla Apache Tribe." R. at 225–26. The district court was correct in noting that this "historical backdrop" of relevant tribal sovereignty—namely, the period of tax immunity from 1891 until 1924—was not present in *Cotton Petroleum*. However, unlike the district court, we do not consider this distinction, as a legal matter, to be so "significant" as to tilt the scales in the Tribe's favor.

As stated above, since the period of complete immunity from state taxation ended in 1924, for a period of more than eight decades, oil and gas lessees on statutory reservations have been either expressly subject to state taxation or have been subject to

30

such taxation absent clear congressional disapproval. In other words, a review of the relevant history of taxation in this field demonstrates that for the lion's share of that history, state taxation has been permitted to some extent. Although this history—which includes a shorter period of immunity followed by a much longer period of exposure to taxation—is relevant and should be taken into consideration, we do not find that the "scales," as the district court put it, are tipped significantly in the Tribe's favor. That is, we do not find that this "backdrop" weighs heavily in favor of a finding of preemption, particularly when viewed in conjunction with the remainder of our analysis. *See Rice*, 463 U.S. at 720 ("If . . . we determine that the balance of state, federal, and tribal interests so requires, our pre-emption analysis may accord less weight to the 'backdrop' of tribal sovereignty." (citing *Washington*, 447 U.S. at 154–59; *Jones*, 411 U.S. 145)).

### C.      State, Federal, and Tribal Interests

Against this "backdrop," we must weigh the state, federal, and tribal interests at stake in order to determine whether the New Mexico taxes are preempted. *Cotton Petroleum*, 490 U.S. at 176–77; *Ramah*, 458 U.S. at 838; *Bracker*, 448 U.S. at 145. As discussed *infra*, the facts demonstrate that this case falls more in line with *Cotton Petroleum* than *Bracker* and *Ramah*. Therefore, we conclude—even when considering the relevant legislation and historical backdrop—that the five challenged taxes are not preempted by federal law in this instance.

As previously noted, in assessing the relevant federal and tribal interest, the Supreme Court has looked primarily to the extent of the federal (and, if applicable, tribal)

31

regulatory scheme.  In *Cotton Petroleum*, the Supreme Court found that although the federal regulations governing oil and gas operations on the reservation were "extensive, they [were] not exclusive, as were the regulations in *Bracker* and *Ramah*."  490 U.S. at 186 (footnote omitted).  *See also Ramah*, 458 U.S. at 839, 843 (noting that the "comprehensive and pervasive" federal scheme "left the State with no duties or responsibilities"); *Bracker*, 448 U.S. at 149 (stating that the "pervasive" and "comprehensive" federal scheme left "no room for [state] taxes," especially since respondents were "unable to identify any regulatory function . . . performed by the State").  The Supreme Court's conclusion in *Cotton Petroleum* that the federal regulations were not "exclusive" was based on the finding that the State regulated "the spacing and mechanical integrity of the wells located on the reservation."  *Id.* at 186–87.  As Justice Blackmun explained in dissent, under the applicable regulatory scheme, at least in terms of well spacing, "state law applie[d] not of its own force, but only if its application [was] approved by the [BLM]."  *Id.* at 206 n.9 (Blackmun, J., dissenting).  Moreover, in *Cotton Petroleum* it was undisputed that the federal regulations in force also addressed well spacing.  *See id.* at 186 n.16 (stating that the applicable "federal regulations address the spacing, drilling, and plugging of wells and impose reporting requirements concerning production and environmental protection" (citing 43 C.F.R. §§ 3160.0-1 to 3186.4 (1987))).  The State, therefore, did not have direct authority to regulate well spacing; it "regulated" well spacing only in the sense that the federal government, which had direct

32

authority to regulate in that area, would often adopt state standards.[25]  In other words,

although the federal government had ultimate authority to regulate well spacing, the State

and the federal government, in practice, had a cooperative regulatory relationship with

regard to well spacing.  In *Cotton Petroleum*, the State's contribution to this cooperative

relationship was enough to support a conclusion that the federal regulations were not

"exclusive," although they were "extensive," and therefore did not necessarily preempt

the state taxes.

The relevant federal regulatory scheme governing oil and gas operations in this

case is largely the same as the regulatory scheme at play in *Cotton Petroleum*.[26]  Notably,

---

[25]      *See also* Rep. Br. of Aplt. Cotton Petroleum Corp., at 8 & n.12, *Cotton Petroleum v. New Mexico*, 490 U.S. 163 (1989) (No. 87-1327) ("A review of the [IMLA] and its regulations reveals that they entrust responsibility in the federal and tribal governments for *all* aspects (financial, environmental, conservation, marketing, safety and transportation) of Reservation oil and gas operations," with one possible exception: "[w]hile 43 C.F.R. § 3162.3-1 regulates Jicarilla Indian Reservation well spacing, the United States, the Tribe, and New Mexico coordinate well spacing on a volunteer basis. Otherwise it is absolutely clear that federal law and federal and tribal governmental programs relieve New Mexico of any responsibility to Jicarilla oil and gas development.").  We are of course free to reference the filings in *Cotton Petroleum* for whatever guidance they might provide for our resolution of the instant matter.  *See United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007) ("[W]e may exercise our discretion to take judicial notice of publicly-filed records in our court and certain other courts concerning matters that bear directly upon the disposition of the case at hand."); *see also St. Louis Baptist Temple v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("[I]t has been held that federal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.").

[26]      As the Tribe correctly asserts, the regulations applicable in *Cotton Petroleum* have been amended, and new regulations implementing the IMDA have been promulgated since the Court's decision in 1989.  *See* Aplee. Br. at 26–32 (discussing developments in the regulatory framework since 1989, and examining the purported

33

under the federal regulatory scheme at issue, the State still plays a supporting regulatory role in that BLM often adopts the State's well-spacing and setback standards and other NMOCD decisions; the district court's findings likewise acknowledge the existence of this cooperative regulatory scheme. *See* R. at 234 (noting that "the State of New Mexico regulations are adopted by the BLM"); *id.* at 193 (explaining that BLM and NMOCD entered into a memorandum of understanding, in which BLM adopted the state standards for well spacing and setbacks on Indian lands); *id.* at 229 ("Acceptable well-spacing programs include not only ones which conform with State rules and orders—when approved by the BLM—but 'any other program established by' the BLM" (quoting 43 C.F.R. § 3161.3-1(a))). This is precisely the type of state "regulation" that was before the Supreme Court in *Cotton Petroleum*.[27] Therefore, even though the federal regulations governing oil and gas operations on the Ute Reservation are "extensive," they are not "exclusive" for purposes of our analysis, as understood by the Supreme Court in *Cotton*

exclusivity of the federal regulations); *see also* 25 C.F.R. pt. 225 (implementing the IMDA). However, the overall statutory and regulatory framework—in terms of the IMLA, which governs almost every agreement entered into by the Tribe—is similar. More importantly, the statutory and regulatory framework governing oil and gas operations on the Ute Reservation, rather than the legal framework governing the IMLA leases or IMDA agreements themselves, is substantially the same as it was when *Cotton Petroleum* was decided. *See* 43 C.F.R. pt. 3160. In other words, it is this area—*viz.*, regulation of oil and gas operations on the Reservation—that we find most important for purposes of our analysis here.

[27]  In addition, the NMOCD also established the oil and gas pools from which the oil and gas operators extract the mineral resources.

*Petroleum.*[28]

Next, we look to the economic burden of the tax. In *Bracker*, *Ramah*, and *Cotton Petroleum*, the Supreme Court found that the economic burden fell on the entity that was directly responsible for the amount of taxes paid to the State.[29] For example, the Court found that the economic burden fell on the tribes in *Bracker* and *Ramah* because the

---

[28] The district court concluded that the federal regulatory scheme was "exclusive," R. at 228–32, despite its acknowledgment that the federal government regularly adopted NMOCD standards and decisions regarding oil and gas operations on the Reservation. The district court labeled this a mixed question of law and fact. *Id.* at 228. However, a finding that federal regulations are "exclusive"—in other words, that "the federal regulatory scheme is so pervasive as to preclude the additional burdens sought to be imposed [by the state law]," *Bracker*, 448 U.S. at 148—is better characterized a legal conclusion that we should review de novo. Even if we were to review the "exclusivity" determination under a deferential standard, this conclusion (at least in this context) would likely be erroneous as it contradicts the Supreme Court's determination in *Cotton Petroleum*.

[29] We recognize that the Supreme Court arguably has adopted a narrow view of the term "economic burden." One could reasonably contend that the economic burden of a state tax on non-tribal entities doing business with a tribe will almost always fall in some fashion on the tribe—even if only indirectly. However, as discussed *infra*, the Supreme Court has previously declined to include such "indirect" and "insubstantial" economic effects within the conceptual scope of the term "economic burden." *See Cotton Petroleum*, 490 U.S. at 187. Instead, in identifying the entity that shoulders the economic burden of the state tax at issue, the Court has looked to the entity that is directly responsible for paying the amount of the tax.

However, we note that this does not necessarily mean that indirect financial burdens on a tribe are categorically barred from the analysis. Indeed, the *Cotton Petroleum* Court noted that the indirect economic burdens identified by the tribe in that case were "*too* indirect and *too* insubstantial to support [a] claim of pre-emption." *Cotton Petroleum*, 490 U.S. at 187 (emphasis added). The underscored language suggests that *some* indirect economic burdens of a *substantial* nature might lend support to a finding of preemption under certain circumstances. However, as further discussed *infra*, the indirect burdens asserted by the Ute Tribe in this case are similar in nature to those rejected by the Supreme Court in *Cotton Petroleum*; therefore, they do not factor into our analysis.

tribes were obligated in both of those cases to fully reimburse the non-Indian entities for the amount of taxes paid to the State. In other words, the cost of the taxes had been passed directly on to the tribes and they were not ultimately paid by the non-Indian entities. *See Ramah*, 458 U.S. at 835 (explaining that the contractor had "included the state gross receipts tax as a cost of construction in [its] bid," and therefore the company "was reimbursed by the [tribe] for the full amount [of taxes] paid"); *Bracker*, 448 U.S. at 140, 151 (stating that the "economic burden of the asserted taxes will ultimately fall on the Tribe," because the Tribe had agreed to reimburse the company for all expenses incurred in connection with its operations, including the state taxes).

By contrast, in *Cotton Petroleum*, the economic burden fell on the non-Indian operators because they paid the taxes, without protest, and the tribe did not reimburse or compensate the operators in any way for those payments. 490 U.S. at 168, 173 n.9, 185. The Jicarilla Apache Tribe argued that it bore the burden of the taxes at issue because they interfered with the tribe's ability to raise its own taxes on oil and gas operations and would diminish the desirability of on-reservation leases. In response, the *Cotton Petroleum* Court stated:

> [i]t is, of course, reasonable to infer that the New Mexico taxes have at least a marginal effect on the demand for on-reservation leases, the value to the Tribe of those leases, and the ability of the Tribe to increase its tax rate. Any impairment to the federal policy favoring the exploitation of on-reservation oil and gas resources by Indian tribes that might be caused by these effects, however, is simply too indirect and too insubstantial to support Cotton's claim of pre-emption. To find pre-emption of state taxation in such indirect burdens on this broad congressional purpose, absent some special factor such as those present

36

in *Bracker* and *Ramah Navajo School Bd.*, would be to return to the pre-1937 doctrine of intergovernmental tax immunity. Any adverse effect on the Tribe's finances caused by the taxation of a private party contracting with the Tribe would be ground to strike the state tax. Absent more explicit guidance from Congress, we decline to return to this long-discarded and thoroughly repudiated doctrine.

*Id.* at 186–87 (footnote omitted). In other words, in rejecting the tribe's argument for preemption in that case, the Court concluded that the indirect burdens on the tribe's ability to raise its own taxes or attract new leases—as opposed to the more direct burden of ultimately bearing the cost of the taxes paid to the State—were insufficient to establish that the economic burden of the taxes fell on the tribe.

In this instance, the five state taxes are paid by the non-Indian operators and, as in *Cotton Petroleum*, those costs are not passed directly on to the Tribe; that is, the Tribe does not reimburse or compensate the operators for the amount of taxes paid to the State. *See* R. at 203 ("The leases and agreements do not directly pass the cost of the five New Mexico taxes on the [Tribe]."). Furthermore, as in *Cotton Petroleum*, the district court found that regardless of the status of the five state taxes (and Resolution No. 3874), the Tribe "has *the authority* to increase severance taxes on existing leases and agreements it has entered into with operators, or to enact a third [tribal] tax." R. at 203 (emphasis added); *cf. id.* at 206 ("There is no record evidence that the imposition of the five New Mexico taxes substantially interferes with the [Tribe's] ability to govern itself."). Therefore, the economic burden—as it was viewed by the Supreme Court in *Bracker*, *Ramah*, and *Cotton Petroleum*—falls on the non-Indian operators, not on the Tribe.

37

Nevertheless, the district court found that, even though the taxes were paid directly by the non-Indian operators and were not passed on to the Tribe, the economic burden of the taxes—as a real-world matter—fell on the Tribe because "the evidence shows that the taxes impair, in practically one-to-one proportion, the ability of the [Tribe] to impose additional taxes." *Id.* at 226; *see also id.* at 227 (stating that in the absence of the five state taxes, the Tribe "could implement Resolution No. 3874 to increase its severance tax and—assuming the market for oil and gas remained stable—raise an additional $1,300,000 in revenue, an increase of approximately $650 per enrolled member per year"); *id.* (indicating that even if the resolution was rescinded, absent the five state taxes, "oil and gas production on the [Reservation] would become more attractive relative to oil and gas production elsewhere in New Mexico, which would result in increased production" and therefore an increase in revenues from royalties and current taxes).

However, these indirect economic burdens on the Tribe's ability to increase its own taxes and attract new leases are akin to the indirect burdens that the Supreme Court dismissed in *Cotton Petroleum*. *See* 490 U.S. at 186–87. "[M]arginal effect[s] on the demand for on-reservation leases, the value to the Tribe of those leases, and the ability of the Tribe to increase its tax rate" are impacts that are "simply too indirect and too insubstantial to support [a] claim of pre-emption." *Id.* at 187.[30] The fact that the Ute

---

[30]    In concluding that indirect burdens of this kind could not support a claim of preemption, the Supreme Court stated that "[i]t is important to keep in mind that the primary burden of the state taxation falls on the non-Indian taxpayers," in that the non-Indian companies paid the taxes and did not directly pass the cost onto the tribe. *Cotton*

Tribe has enacted a resolution providing for a contingent increase in taxes does not materially change this result; the crux of the district court's conclusion still centers on the indirect burden imposed on the Tribe's ability to raise taxes or attract new leases, albeit through the implementation of Resolution No. 3874. In any event, as stated above, the district court found that regardless of the status of the five state taxes and the resolution, the Tribe's authority to raise its own oil and gas taxes is not impaired.[31] Accordingly, the economic burden relied upon by the district court, at least for present purposes, is not a proper justification for finding that the taxes are preempted.

Lastly, we must consider the State's interest—more specifically, the State's asserted justifications for imposing the taxes. In order to justify a state tax on non-Indian actors operating on Indian land, the State generally must be able to show that it "seeks to assess [the] taxes in return for governmental functions it performs for those on whom the taxes fall." *Bracker*, 448 U.S. at 150. A "generalized interest in raising revenue" is not sufficient to justify the state taxation in this context. *Id.*; *see also Ramah*, 458 U.S. at 845

---

*Petroleum*, 490 U.S. at 187 n.18. This reasoning applies with equal force in the present case because, as we have already established, the primary burden of the five state taxes falls on the non-Indian oil and gas lessees, not the Tribe. However, as previously discussed, *see supra* note 29, neither our holding nor the Supreme Court's holding in *Cotton Petroleum* purports to categorically bar the consideration of indirect economic burdens shouldered by a tribe. We simply hold that the indirect burdens asserted by the Ute Tribe—which are similar in nature to those rejected by the *Cotton Petroleum* Court—do not support a finding of preemption in this case.

[31] Although this ability is theoretically limited in regard to one agreement that caps the Tribe's tax and royalty revenues at 30%, the district court found "th[at] agreement[] [is] currently substantially below 30%," and an increase to 30% would be "substantial." R. at 203–04.

(stating that "the generalized desire to collect revenue" was not a proper justification for imposing the state tax).

In *Bracker* and *Ramah*, the Court noted that it was "unable to identify *any* legitimate regulatory function or service [that the state] performed . . . that would justify the assessment of [the] taxes." *Cotton Petroleum*, 490 U.S. at 184 (emphasis added) (quoting *Bracker*, 448 U.S. at 148–49) (internal quotation marks omitted). Those cases "involved *complete* abdication or noninvolvement of the State in the on-reservation activity." *Id.* at 185 (emphasis added). On the other hand, in *Cotton Petroleum*, the State provided "substantial services" to both the Jicarilla Apache Tribe and the non-Indian operator, costing the State approximately $3 million per year, *id.*, which served as a sufficient justification for the taxes.

In this case, the district court itself acknowledged that the State "is not absolutely uninvolved in the oil and gas operations on the [Reservation]." R. at 234. As the district court noted, the services provided to the oil and gas operators on the Reservation include "a hearing process for resolving disputes between operators, publicly available geologic records, publicly available production records, and records of sales and transfers," as well as "plugging of abandoned wells" and "environmental cleanup and site inspection." *Id.* at 199. However, because the evidence demonstrated that these services were rarely, if ever, utilized by the oil and gas operators or the Tribe in connection with the on-reservation activity, the district court found that these services only were offered "in theory" and only provided a "*de minimis*" benefit. *Id.* at 201, 232–33. Based on this

reasoning, the district court concluded that the State's interest was "minimal." *Id.* at 233.

We disagree.

First, as previously discussed, the State plays a supporting regulatory role in the regulation of well spacing, setbacks, and non-standard well location. This "specific, legitimate regulatory interest" serves as a partial justification for the imposition of the state taxes. *Ramah*, 458 U.S. at 843; *see Bracker*, 448 U.S. at 144 (stating that "any applicable regulatory interest of the State must be given weight" (citing *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 171 (1973))). We also afford some weight to the services, enumerated by the district court, that are provided on the Reservation—such as a hearing process and the provision of records—despite the fact that the Tribe and the lessees scarcely utilize them. In other words, this is not a case—like those before the Supreme Court in *Bracker* and *Ramah*—"involv[ing] complete abdication or noninvolvement of the State in the on-reservation activity." *Cotton Petroleum*, 490 U.S. at 185.

However, the more important state service—and the one that primarily justifies the New Mexico taxes at issue—is the off-reservation infrastructure used to transport the oil and gas after it is severed. Oil extracted from the Reservation "is transported by truck through New Mexico to refineries outside the [Reservation]" on highways that are constructed and maintained by the State. R. at 184, 200. Natural gas extracted from the Reservation is transported "through gathering pipelines in the [Reservation] to main lines in New Mexico." *Id.* at 184, 201. The State regulates these pipelines in that it, *inter alia*,

41

"provides the power [and] authority to the pipeline companies to condemn property . . . to construct the pipelines" and "inspects the pipelines for safety purposes." Oral Argument at 11:05; *see also, e.g.*, Pipeline Safety Act, N.M. Stat. Ann. §§ 70-3-1 to -22; Gathering Line Land Acquisition Act, N.M. Stat. Ann. §§ 70-3A-1 to -7.

The district court found that "[t]he State provides *substantial* services by regulating the off-reservation infrastructure that makes transport of oil and gas possible." R. at 201 (emphasis added). In fact, the evidence presented at trial made clear that "[w]ithout the off-reservation infrastructure in New Mexico to transport oil and gas, the economic value of the oil and gas produced on the [Reservation] would be *substantially less*." *Id.* (emphasis added). The State's counsel highlighted this point during oral argument:

> The gas only takes on significant economic value when it is processed. It is processed in New Mexico, off the Reservation. It travels from the Reservation to the processing plant on gathering lines and pipelines that are regulated by the State of New Mexico and whose existence is made possible by New Mexico statutes.
> . . . .
> . . . We're dealing with natural gas, which only obtains its value—a value which drives the value of the royalty enjoyed by the Tribe, the tribal taxes, and the income of the non-tribal lessees—through [the lessees'] utilization of this whole infrastructure New Mexico has made available.

Oral Argument at 9:33, 12:03. We conclude that this "substantial service" provided by the State—which "substantially" contributes to the economic value of the resources extracted—serves as a legitimate and important justification for the imposition of the

42

State's taxes.[32]  The State's asserted interest amounts to much more than a "general desire to raise revenue."  *Ramah*, 458 U.S. at 839; *Bracker*, 448 U.S. at 150.  In other words, this is clearly "not a case in which the State has had nothing to do with the on-reservation activity, save tax it."  *Cotton Petroleum*, 490 U.S. at 186.[33]

The district court concluded, as the Tribe argues on appeal, that *Ramah* prohibits any consideration of the off-reservation infrastructure in the analysis.  In *Ramah*, the Supreme Court concluded that the state services provided to the non-Indian contractor for its activities off the reservation could not serve as a justification for taxing the on-reservation activity.  458 U.S. at 843–44.  The Court posited that "the state tax revenues derived from [the contractor's] off-reservation business activities [were] adequate to reimburse the State for the services it provide[d]" to the contractor off the reservation.  *Id.* at 844 n.9.  Therefore, *Ramah* conceivably could be read—as the Tribe urges us to read it here—as categorically barring the consideration of off-reservation services provided to non-Indian actors as the predicate for taxes imposed on on-reservation activity.

However, what the *Ramah* Court stated was that the off-reservation services

---

[32]    We do not purport to hold that off-reservation infrastructure or services may be considered in *every* instance where they provide a benefit of *any* magnitude to the on-reservation activity.  We do, however, consider such infrastructure and services here due to their undisputed "substantial" benefit to the value of the on-reservation activity.

[33]    "Nor is this a case in which an unusually large state tax has imposed a substantial burden on the Tribe."  *Cotton Petroleum*, 490 U.S. at 186.  In fact, as the district court concluded, "[t]here is no record evidence that the imposition of the five New Mexico taxes substantially interferes with the [Ute Tribe's] ability to govern itself."  R. at 206.

43

provided to the non-Indian entity could not serve as "a legitimate justification for a tax whose ultimate burden [fell] *on the tribal organization.*" *Id.* at 844 (emphasis added). In other words, because the economic burden ultimately fell *on the tribe*, the services that the state provided *to the contractor* for activity *off the reservation* were not a sufficient justification. *Cf. Bracker*, 448 U.S. at 150 (noting that a state generally may "seek[] to assess taxes in return for governmental functions it performs for those *on whom the taxes fall*"). In the present case, unlike in *Ramah*, the economic burden of the tax falls on the non-Indian operators, not the Tribe.

Furthermore, there is no indication that the asserted off-reservation services provided to the non-Indian contractor in *Ramah* in any way related to the on-reservation activity the state sought to tax. In contrast, the services provided off the reservation in this instance substantially benefit and relate to the on-reservation activity being taxed. In fact, without the off-reservation infrastructure, the economic value of the resources—which "drives the value of the royalty enjoyed by the Tribe, the tribal taxes, and the income of the non-tribal lessees," Oral Argument at 12:08—"would be *substantially less*." R. at 201 (emphasis added). This case, therefore, can be distinguished from *Ramah*.

The Supreme Court's decision in *New Mexico v. Mescalero Apache Tribe* could also be read to permit the consideration of state services or functions as long as they are *connected to* the on-reservation activity in some substantial way, regardless of whether those services or functions are carried out on or off the tribal reservation. In that case, the

44

issue was whether the State of New Mexico could regulate the hunting and fishing activities of non-Indians on the tribe's reservation. *Mescalero Apache Tribe*, 462 U.S. at 325. At the outset, the Court noted that "[t]he exercise of State authority which imposes additional burdens on a tribal enterprise must ordinarily be justified by functions or services performed by the State *in connection with* the on-reservation activity." *Id.* at 336 (emphasis added) (citing *Ramah*, 458 U.S. at 843–44 & n.7; *Bracker*, 448 U.S. at 148–49). In concluding that New Mexico's authority was preempted by federal law, the Court noted that "the State ha[d] pointed to no services it ha[d] performed *in connection with* hunting and fishing by nonmembers which justif[ied] imposing a tax in the form of a hunting and fishing license," and stated that the State's "general desire to obtain revenues [wa]s simply inadequate to justify the assertion of concurrent jurisdiction." *Id.* at 343 (emphasis added); *see also Barona Band of Mission Indians v. Yee*, 528 F.3d 1184, 1193 (9th Cir. 2008) ("We recognize that the state interest strengthens where there is a nexus between the taxed activity and the government function provided . . . ." (citing *Ramah*, 458 U.S. at 843)). The off-reservation services that the State provides in this instance are undoubtedly "connected to" the on-reservation activity being taxed.

The district court's contrary determination that off-reservation infrastructure and services provided by the State should "play no part in the analysis," R. at 234, was based on two observations. First, the district court stated that "*Ramah* instructs that services provided outside the reservation are not to be taken into account in *Bracker* balancing." *Id.* As discussed *supra*, however, the Supreme Court's decision in *Ramah* does not

45

categorically bar consideration of off-reservation services provided to the taxed entity. And we have further distinguished *Ramah* from the instant case because here the off-reservation services that the State provides substantially benefit and relate to the on-reservation activity being taxed.

The district court's refusal to consider the off-reservation infrastructure was also based on its observation that "[i]n *Bracker*, the economic value of the tribal timber would likely have been minimal in the absence of Arizona state roads outside the White Mountain Apache Reservation to transport the timber to market, but those state roads played no part in the analysis." *Id.* (citing *Bracker*, 448 U.S. at 146–52). However, in *Bracker* the Supreme Court indicated that the timber was harvested, processed, and sold *on the reservation. See* 448 U.S. at 139 (stating that the logging company's activities—which included "fell[ing] trees, cut[ting] them to the correct size, and *transport[ing] them to [the tribe's] sawmill* in return for a contractually specified fee"—were performed "*solely on the Fort Apache Reservation*," and that the timber was "manage[d], harvest[ed], *processe[d], and s[old] . . . on the reservation.*" (emphasis added)). Therefore, contrary to the district court's statement, it appears that the timber harvested from the reservation in *Bracker* took on its economic value *on the reservation* without the required use of any off-reservation infrastructure provided by the state. By contrast, the mineral resources severed from the Ute Reservation only take on significant economic value when they are processed off the Reservation, which is only made possible by the off-reservation infrastructure. And furthermore, we also note that in *Bracker*,

46

unlike the present case, the economic burden of the tax fell on the tribe. Accordingly, we cannot agree with the district court's decision to disregard the "substantial services" provided to the lessees off the Reservation. R. at 201.

In sum, the Supreme Court has not instructed that the type of off-reservation services presently before us—that substantially relate to and benefit the on-reservation activity and that benefit the entity that directly bears the economic burden of the tax—cannot be considered under *Bracker*, *Ramah*, and *Cotton Petroleum*. What the Supreme Court has made clear, however, is that we are to conduct a "particularized examination" that is "sensitive to the particular facts and legislation involved." *Cotton Petroleum*, 490 U.S. at 177. In this specific situation, where the burden of the tax falls on the non-Indian lessees and the off-reservation infrastructure substantially benefits the on-reservation activity, we think it is appropriate for us to consider the off-reservation infrastructure as part of the equation.

In conclusion, the evidence presented, particularly in light of the Supreme Court's decision in *Cotton Petroleum*, demonstrates that (1) the federal regulatory scheme is not "exclusive," although it is indeed "extensive"; (2) the economic burden—as that concept was applied by the Supreme Court in *Bracker*, *Ramah*, and *Cotton Petroleum*—falls on the non-Indian operators, not on the Tribe; and (3) the State has asserted a sufficient justification for imposing the taxes. Furthermore, although there is an "historical backdrop" of relevant tribal sovereignty in this area, which was not present in *Cotton Petroleum*, this backdrop is not so strong as to completely tip the scales in the Tribe's

47

favor. Therefore, under the flexible preemption analysis applied in *Bracker*, *Ramah*, and *Cotton Petroleum*, we hold that the five state taxes are not preempted by federal law, even when considered in light of the purposes of the relevant legislation and the history of tribal sovereignty in the field.

## CONCLUSION

Based on the foregoing, we **REVERSE** the district court's judgment and **REMAND** the case for further proceedings not inconsistent with this opinion.

09-2276, <u>Ute Mountain Ute Tribe v. Rodriguez</u>

**LUCERO**, J., dissenting.

Although I concur in my colleagues' statement of the law, I cannot do so with respect to their application of the law to the facts. In contrast to the Jicarilla Apache Tribe in <u>Cotton Petroleum Corp. v. New Mexico</u>, 490 U.S. 163 (1989), the Ute Mountain Ute Tribe in the case before us presented evidence and the district court found that: (1) New Mexico's taxation of on-reservation oil and gas extraction imposes a substantial economic burden on the tribe; and (2) neither the tribe nor private oil and gas companies receive any on-reservation economic benefit in return. These findings compel the conclusion that the New Mexico taxes are preempted. It is not enough to correctly state the law; by not adhering to it, we deny parties their due justice and distort the jurisprudence of the Supreme Court. Thus I must respectfully dissent.

## I

My colleagues thoughtfully explain the basic legal principles that distinguish Indian law preemption from traditional implied preemption doctrine. (Majority Op. 14-23.) I have no problem with most of that discussion. Although "generalizations on [Indian law preemption remain] treacherous," <u>White Mountain Apache Tribe v. Bracker</u>, 448 U.S. 136, 141 (1980), the roadmap for this case was drawn by the Supreme Court in <u>Cotton Petroleum</u>, which examined the same five New Mexico taxes at issue in this case as applied on the Jicarilla Apache reservation. 490 U.S. at 168-69. Four factors that

control this appeal were enumerated by the Supreme Court[1]:  (1) the historical backdrop of tribal sovereignty in an area; (2) the extent of the federal regulatory scheme; (3) the tribe's sovereign and economic interests; and (4) the state's interests as reflected by services that it provides.  Id. at 177, 182, 184-86.

I agree with the majority's conclusions as to the first and second of these factors. The history of Ute Mountain Ute sovereignty over oil and gas leasing is relevant but not decisive (Majority Op. 30-31), and the federal regulatory scheme is "extensive [but] not exclusive" (Majority Op. 34).  But, given the district court's uncontested factual findings, the final two factors lead to my conflicting point of view.

## II

There is no dispute; indirect taxes—that is taxes paid by an entity other than the tribe itself—may burden an Indian tribe enough to justify a finding of preemption in some circumstances.  See Cotton Petroleum, 490 U.S. at 187 n.17; Montana v. Crow Tribe of Indians, 484 U.S. 997 (1988) summarily aff'g 819 F. 2d 895 (9th Cir. 1987); Ramah Navajo Sch. Bd. v. Bureau of Revenue of New Mexico, 458 U.S. 832, 836-37 (1982).   The majority concedes as much.  (Majority Op. 35 n.29.)

---

[1] In other contexts, the Supreme Court has considered additional factors in determining if a state tax is preempted, including whether there is value added on the reservation by the regulated activity, California v. Cabazon Band of Mission Indians, 480 U.S. 202, 219-20 (1987), whether the tribe is simply marketing a tax exemption on the reservation, Washington v. Confederated Tribes of the Colville Indian Reservation, 447 U.S. 134, 155 (1980), and whether the regulated activity has an off-reservation effect that "necessitate[s] State intervention," New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 336 (1983).

The principle that an indirect economic burden on a tribe may support preemption of a state tax originates in <u>Ramah Navajo</u>. 458 U.S. at 835-36, 846-47. There, New Mexico taxed private construction companies for activities on the Navajo reservation. <u>Id.</u> at 835. The "legal incidence" of the tax fell squarely on the construction contractors. <u>Id.</u> at 836, 844 n.8. But the tribe agreed to reimburse contractors for the tax. <u>Id.</u> at 835-36. Thus, the Supreme Court recognized that "the economic burden of the asserted taxes would ultimately fall on the Tribe," <u>id.</u>, and held the tax was preempted in part because of "burdens . . . imposed indirectly through a tax on a non-Indian contractor . . . ." <u>Id.</u> at 844 n.8. As the dissent in <u>Ramah Navajo</u> characterized the opinion, "the Court clearly [chose] to bar the State from taxing [the private contractor] principally because the tax impose[d] an indirect economic burden on the tribal organization." <u>Id.</u> at 854 (Rehnquist, J., dissenting).

Although the Court did not explain precisely when an indirect tax should be considered burdensome to a tribe, <u>Cotton Petroleum</u> provides us some guidance. In particular, <u>Cotton Petroleum</u>'s focus on trial court findings of fact strongly suggests that the degree of economic burden is best determined by the fact-finder. <u>See</u> 490 U.S. at 185-86, 187 n.17. And unlike in <u>Cotton Petroleum</u>, the district court in this matter found that New Mexico's taxation of oil and gas extractors creates a substantial economic burden on the Ute Mountain Ute.

<u>Cotton Petroleum</u> turned on facts found by the New Mexico state district court. 490 U.S. 185-86. Although the Jicarilla Apache were not a party to either the New Mexico proceedings or the Supreme Court proceedings, the trial court made several

findings concerning the tribe's interests. Importantly, the trial court determined that "no economic burden [fell] on the tribe by virtue of the state taxes," and that the tribe could increase its taxes without adversely affecting its oil and gas development. Id. at 185 (quotation and alteration omitted).[2] Thus, the Supreme Court concluded that any burden asserted by the Jicarilla Apache, as amicus, was "too indirect and too insubstantial to support" preemption. Id. at 187.

In reaching this conclusion, the Court distinguished Montana, a case it summarily affirmed a year prior to Cotton Petroleum. 490 U.S. at 187 & n.17. Montana considered whether certain state taxes on coal extraction were preempted as applied on the Crow Tribe's reservation. Before the Ninth Circuit, Montana had argued that its taxes did "not burden Crow's economic interests because the Tribe itself does not pay the tax . . . the taxes were imposed on the lessee . . . and the Tribe had no duty to reimburse." Crow Tribe of Indians v. Montana, 819 F.2d 895, 899 (9th Cir. 1987). However, an economic expert explained that the state taxes adversely affected tribal coal production and marketability. Id. at 899-900. Seizing on these facts, the Cotton Petroleum Court concluded that the indirect economic burden in Montana was distinguishable because "the [Montana] taxes had a negative effect on the marketability of coal . . . ." 490 U.S. at 186, n.17. Because the Jicarilla Apache—unlike the Crow—made no showing that the state taxes affected the marketability of their oil and gas, the Court held that Montana was inapplicable.

---

[2] These facts were uncontested before the trial court. Cotton Petroleum v. State, 745 P.2d 1170, 1172 (N.M. Ct. App. 1987).

-4-

In this case, the Ute Mountain Ute have presented for our consideration facts that are more analogous to <u>Montana</u> and <u>Ramah Navajo</u>. Although the majority conducts an economic burden analysis anew, it is not our office to do so. One must keep in mind that the district court conducted a trial, heard expert testimony, and rendered detailed factual findings, which are now uncontested. As in <u>Montana</u>, the tribe's economic expert testified that the state taxes affect the production and marketability of tribal oil and gas leases. In its findings, the district court concluded that oil and gas production on Ute Mountain Ute lands would be "more attractive" to producers without the taxes and the New Mexico taxes "impose an economic burden on the [tribe] and its members."

Further, as in <u>Ramah Navajo</u>, although the legal incidence of the tax falls on the oil and gas companies, the Ute Mountain Ute lose revenue because they cannot impose the same taxes. The Ute Mountain Ute passed a resolution stating that if the New Mexico taxes were struck down, the tribe would replace them with tribal taxes. Thus, just like the contract provision in <u>Ramah Navajo</u>, the resolution ensures that any revenue collected by New Mexico is revenue the tribe loses. A Ute Mountain Ute tribal tax in the amount equal to the New Mexico taxes would provide an additional $650 per tribal member—no small sum for a tribe whose yearly per capita income is a scant $8,159.[3]

---

[3] Although true that no legal barrier prevents the tribe from imposing a tax equal to that imposed by the state and collecting revenue, <u>see</u> <u>Merrion v. Jicarilla Apache Tribe</u>, 455 U.S. 130 (1982), the district court found that state taxes create an economic barrier to the tribe's ability to raise revenue. The trial court's findings in <u>Cotton Petroleum</u> were precisely the opposite. 490 U.S. 171-72 (trial court "found that the state taxes had not affected the Tribe's ability . . . to impose a higher tax").

But the majority concludes that the effect of the taxes is "too indirect and too insubstantial" to be considered in the preemption analysis. (Majority Op. 38.) In spite of its reassurance that indirect economic burden may, under other unidentified facts, support a holding of preemption (Majority Op. 35 n.29), the majority seems to have elevated an undisputed fact found by a New Mexico trial court over twenty years ago to a principle of law that binds all tribes indirectly burdened by state taxation. I would leave such fact-finding to the trial courts. The expert testimony proffered by the tribe and adopted by the district court is sufficient to distinguish this case from Cotton Petroleum and support the conclusion that the New Mexico taxes create a substantial economic burden on the Ute Mountain Ute Tribe.

**III**

I also disagree with my colleagues' treatment of the fourth Cotton Petroleum factor: the state's interest in taxation of on-reservation oil and gas extraction. Cotton Petroleum was "not a case in which the State [had] nothing to do with the on-reservation activity, save tax it." 490 U.S. at 186. But this is such a case. In light of the absence of state services utilized by the tribe and on-reservation contractors, this factor strongly supports preemption.

In Cotton Petroleum, the trial court concluded that New Mexico provided "substantial services to both the Jicarilla Tribe and Cotton" approximating $3 million per year. Id. at 185. Indeed, New Mexico "spen[t] as much per capita on members of the Tribe" as it did on non-members. Id. at 171 n.7. Moreover, Cotton Petroleum Corp. conceded that it benefitted substantially from New Mexico's services and admitted to

-6-

receiving $89,384 to assist its operations.  Id. at 185.  Distinguishing Ramah Navajo, the Court determined that these "substantial services," provided to both the tribe and the company on the reservation, supported New Mexico's contention that the taxes were not preempted.  Id.

Ramah Navajo explicitly considered the effect of state services provided to a contractor off-reservation.  458 U.S. at 844.  See also Cent. Mach. Co. v. Ariz. State Tax Comm'n, 448 U.S. 160, 169-70 (1980) (Stewart, J., dissenting) (scolding the Court for ignoring the state's provision of off-reservation services).  The Court roundly rejected the suggestion that off-reservation services could justify a tax whose "burden falls on the tribal organization."  Ramah, 458 U.S. at 844.

Although the majority recognizes the salient distinction between on- and off-reservation services, my colleagues read Ramah Navajo as suggesting that this factor matters only if the burden of the tax falls on the tribe.  (Majority Op. 44.)  As discussed supra, the burden of the taxes in this case does fall on the Ute Mountain Ute, albeit indirectly.  Ramah Navajo does not support the majority's conclusion even under the majority's reasoning.  Immediately following the sentence upon which the majority relies, the Court stated:  "although the state may confer substantial benefits on [the contractor] as a state contractor, we fail to see how these benefits can justify a tax imposed on the construction of school facilities on tribal lands."  458 U.S. at 844.  This statement is consonant with the Court's conclusion in White Mountain Apache that "though the reservation boundary is not absolute, it remains an important factor to weigh

-7-

in determining whether state authority has exceeded the permissible limits." 448 U.S. 136, 151 (1980).

According to the district court, New Mexico "provides substantial services by regulating the off-reservation infrastructure that makes transport of oil and gas possible." Such provisions fall squarely outside the scope of our analysis as delimited by Ramah Navajo and Cotton Petroleum. Neither case considered off-reservation services provided by the state to the company to be a significant part of the preemption analysis. And this distinction makes perfect sense. New Mexico may tax oil and gas companies for their activities off the reservation to compensate for services the state provides generally. As the Ramah Navajo Court stated, "[p]resumably, the state tax revenues derived from [the contractor's] off-reservation business activities are adequate to reimburse the State for the services it provides . . . ." 458 U.S. at 844 n.9. Thus, New Mexico may receive its due compensation without interfering with the Ute Mountain Ute economy.

Because New Mexico provides no on-reservation services[4] to the Ute Mountain Ute or to oil and gas companies, the state's interest in taxation is minimal.

**IV**

I cannot agree with the majority's conclusion that the economic effect of the challenged taxes on the Ute Mountain Ute is "too indirect and too insubstantial." Nor can

---

[4] The state also points to the fact that it offers companies and the tribe many of the services provided to off-reservation oil and gas extractors, such as use of its dispute resolution forum. But because the federal government and the tribe perform these services, there is no need for New Mexico to provide them. Quite to the contrary, the Ute Mountain Ute have rejected such services. Mere proffer of assistance to a tribe does not create a state interest in taxing on-reservation activities.

I agree that New Mexico's provision of off-reservation services may be used to justify taxation of on-reservation activities. Because of the extensive (if not exclusive) federal regulation of tribal oil and gas extraction, the economic burden borne by the Ute Mountain Ute, and New Mexico's de minimis interest in collecting the taxes at issue, the district court should be affirmed. I respectfully **DISSENT**.