IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

SOUTH POINT ENERGY CENTER LLC, *Plaintiff/Appellant*,

*v.*

ARIZONA DEPARTMENT OF REVENUE, et al., *Defendants/Appellees*.

No. 1 CA-TX 20-0004
FILED 3-19-2024

Appeal from the Arizona Tax Court
No.  TX2013-000522
TX2014-000451
TX2015-000850
TX2016-001228
TX2017-001744
TX2018-000019
TX2019-000086
(Consolidated)

The Honorable Christopher T. Whitten, Judge

**AFFIRMED**

COUNSEL

Lewis Roca Rothgerber Christie LLP, Phoenix
By Patrick Derdenger, Karen M. Jurichko Lowell
*Co-Counsel for Plaintiff/Appellant*

Dickinson Wright PLLC, Phoenix
By Bennett Evan Cooper, Vail C. Cloar
*Co-Counsel for Plaintiff/Appellant*

Gammage & Burnham, P.L.C., Phoenix
By Cameron C. Artigue, Christopher L. Hering
*Counsel for Defendants/Appellees Arizona Department of Revenue and Mohave County*

Arizona Attorney General's Office, Phoenix
By Kimberly J. Cygan
*Counsel for Defendant/Appellee Arizona Department of Revenue*

Arizona Attorney General's Office, Phoenix
By Jerry A. Fries
*Counsel for Defendant/Appellee Mohave County*

Kewenvoyouma Law, PLLC, Tempe
By Verrin T. Kewenvoyouma, Christopher Love
*Co-Counsel for Amici Curiae Fort Mojave Indian Tribe, et al.*

Jenner and Block, LLP, Washington, D.C.
By Charles W. Galbraith, *Pro Hac Vice*
*Co-Counsel for Amici Curiae Fort Mojave Indian Tribe, et al.*

———————————————

**OPINION**

Judge Cynthia J. Bailey delivered the opinion of the Court, in which Presiding Judge Paul J. McMurdie and Judge D. Steven Williams joined.

———————————————

**B A I L E Y**, Judge:

¶1　　　Plaintiff South Point Energy Center, LLC ("South Point") appeals the tax court's summary judgment for the Arizona Department of Revenue ("ADOR") and Mohave County (collectively, "the County"). South Point argues that the tax court erred in concluding that the County's valuation and taxation of South Point's electric power generating plant ("the Plant") is not preempted under *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980). The issue comes to us on remand from the Arizona Supreme Court, which directed us to consider whether applying the *Bracker* interest-balancing test evidences Congress's implicit intent to preempt taxing the Plant—a question previously raised by South Point on appeal but not decided by this court. *See S. Point Energy Ctr. LLC v. Ariz. Dep't of Revenue* (*South Point I*), 251 Ariz. 263, 268, ¶ 24 (App. 2021), *vacated in part*

*and remanded by S. Point Energy Ctr. LLC v. Ariz. Dep't of Revenue* (*South Point II*), 253 Ariz. 30, 39, ¶¶ 37–38 (2022). For the following reasons, we affirm the tax court, which correctly ruled that the Plant is not exempt from the County's tax under *Bracker*.

**FACTS AND PROCEDURAL HISTORY**[1]

**¶2** In 1999, Calpine Construction Finance Co. ("Calpine"), a non-Indian-owned entity, leased 320 acres of undeveloped land on a long-term basis from the Fort Mojave Indian Tribe ("the Tribe") to build and operate the Plant on reservation land. Beginning operations in 2001, the Plant is a "merchant plant" that sells electrical energy to public and private utility companies for resale to end-users. It does not supply electrical power to the Tribe or any person or entity on the reservation. The Tribe did not finance the Plant and does not contribute any operating funds.

**¶3** Mohave County then assessed ad valorem property taxes against the Plant based on valuations determined by ADOR. *See* former Ariz. Const. art. 9, § 2(13) ("All property in the state not exempt under the laws of the United States or under this constitution or exempt by law under the provisions of this section shall be subject to taxation to be ascertained as provided by law.")[2]; *accord* Ariz. Rev. Stat. ("A.R.S.") § 42-11002. ADOR assessed the value of the Plant itself and the personal property used to operate the Plant; ADOR did not assess the value of the underlying land.

**¶4** Calpine paid the taxes and unsuccessfully sued for a refund, arguing the Tribe, as lessor, owned all improvements to the leased property, thereby exempting the Plant from state taxation according to federal law. *See Calpine Constr. Fin. Co. v. Ariz. Dep't of Revenue*, 221 Ariz. 244, 249, ¶ 22 (App. 2009); *see also Cass Cnty. v. Leech Lake Band of Chippewa Indians*, 524 U.S. 103, 110 (1998) ("State and local governments may not tax Indian reservation land 'absent cession of jurisdiction or other federal

---

[1] The facts set out in this section are largely taken from our supreme court's opinion in *South Point II*. *See* 253 Ariz. at 31–33, ¶¶ 2–8.

[2] In the November 8, 2022 general election, voters approved Proposition 130 to amend the Arizona Constitution with regard to property tax exemption provisions. Article 9, Section 2, of the Arizona Constitution was amended effective December 5, 2022, to reflect the results of the election, and Section 2(A) now provides: "All property in this state that is not exempt under the laws of the United States or under this section is subject to taxation as provided by law."

statutes permitting it.'" (quoting *Cnty. of Yakima v. Confederated Tribes & Bands of Yakima Nation*, 502 U.S. 251, 258 (1992))). On appeal, this court acknowledged the general rule that a lessor owns all real property improvements made by a lessee, but concluded the parties' lease varied that rule by providing that Calpine owned all improvements. *Calpine Constr.*, 221 Ariz. at 248, ¶¶ 16–17. Consequently, this court affirmed the tax court's judgment that Calpine was liable for property taxes based on the value of the Plant and related personal property. *See id.* at 246, ¶ 1.

¶5         After a series of transactions involving Calpine and several of its related entities, the Tribe's land and the Plant were sublet to South Point, another Calpine-related entity, with the Tribe's consent and approval by the United States Bureau of Indian Affairs ("the BIA"). In 2012, the Tribe and Calpine's successor-lessees, which are included in references to "South Point," executed an amended lease that remained in place during this lawsuit. The amended lease provides that no partnership exists between the Tribe and South Point. The amended lease also reaffirms that the Plant and "all [i]mprovements and associated materials, supplies, and equipment" are "owned and controlled" by South Point, and that at the expiration of the lease, South Point must remove all above-ground real property improvements and personal property, excepting roads and foundations.

¶6         The amended lease contemplates that ad valorem property taxes may be assessed on the Plant. In addition, the amended lease requires South Point to timely pay all taxes levied by any governmental entity to prevent the imposition of any liens and to hold the Tribe harmless against any imposed liens. The BIA approved the amended lease.

¶7         South Point initiated these consolidated lawsuits seeking a refund of payments for property taxes imposed from 2010 to 2018, to the extent they were based on valuations of the Plant. *See* A.R.S. § 42-11005 (authorizing a lawsuit to recover illegally levied, assessed, or collected taxes). South Point did not challenge the tax assessments based on ownership of the Plant, as Calpine did in its earlier lawsuit. Instead, South Point argued that § 5 of the Indian Reorganization Act of 1934 ("the Act"), *see* 25 U.S.C. § 5108 (former 25 U.S.C. § 465), expressly preempts states from imposing property taxes on any real property improvements, regardless of ownership, located on land held in trust by the federal government to benefit Indian tribes or individual Indians. Alternatively, South Point argued that applying the balancing test announced in *Bracker* demonstrates Congress's implicit intent to preempt taxing the Plant.

4

¶8	The tax court rejected both of South Point's arguments and granted summary judgment for the County. We reversed, concluding § 5 of the Act expressly and categorically exempted permanent improvements on the Tribe's land from state taxation regardless of ownership. *See South Point I*, 251 Ariz. at 269, ¶ 30. We remanded for the tax court to conduct an analysis under *Whiteco Industries, Inc. v. Commissioner*, 65 T.C. 664 (1975),[3] to determine which, if any, of the assets making up the Plant constituted permanent tax-exempt improvements. *South Point I*, 251 Ariz. at 269, ¶ 30. We did not apply the *Bracker* balancing test but directed the tax court to do so in considering whether property taxes on the Plant's impermanent assets were preempted. *Id.*

¶9	The Arizona Supreme Court granted the County's petition for review to decide whether the Act's § 5 "expressly preempts taxing permanent improvements constructed on tribal lands acquired under that section when those improvements are owned by non-Indians." *South Point II*, 253 Ariz. at 33, ¶ 9. The supreme court then vacated a portion of our opinion, holding that the Act does not expressly preempt Mohave County's ad valorem property tax on the Plant. *Id.* at 31, 39, ¶¶ 1, 37–38. The court remanded the case to this court, *see* ARCAP 23(m)(2), to decide the remaining issue we had not addressed: "whether the tax court correctly ruled that the Plant is also not impliedly exempt from the County's tax under *Bracker*," *South Point II*, 253 Ariz. at 39, ¶ 37.

¶10	On remand, we ordered additional briefing by the parties and invited other interested parties to file amicus briefs, setting forth their respective positions on the issue.[4] We now address the question presented to us on remand, and after consideration of *Bracker* and its progeny, we affirm the tax court.

## DISCUSSION

¶11	"We review the tax court's entry of summary judgment de novo, viewing the facts in the light most favorable to South Point as the nonmoving party." *South Point II*, 253 Ariz. at 33, ¶ 10 (citing *Dinsmoor v.*

---

[3] Whether an asset is a permanent improvement or personal property turns on the guidelines set out in *Whiteco*. *See* 65 T.C. at 672–73. *See also PPL Corp. v. Comm'r*, 135 T.C. 176, 193–97 (2010); *Trentadue v. Comm'r*, 128 T.C. 91, 99–108 (2007).

[4] At oral argument on remand, the parties agreed that we need not remand for a *Whiteco* analysis.

*City of Phoenix*, 251 Ariz. 370, 373, ¶ 13 (2021)). We will affirm if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* (citing *Dinsmoor*, 251 Ariz. at 373, ¶ 13; Ariz. R. Civ. P. 56(a)).

**¶12** Preemption is a question of law, and we can decide the issue "based on a *de novo Bracker* analysis of the record before us." *Seminole Tribe of Fla. v. Stranburg*, 799 F.3d 1324, 1329 (11th Cir. 2015). The burden rests on South Point, as plaintiff, to prove implied federal preemption of state law. *See Pickerel Lake Outlet Ass'n v. Day Cnty.*, 953 N.W.2d 82, 92, ¶ 23 (S.D. 2020).

**¶13** Our primary goal in interpreting federal statutes is to determine and give effect to Congress's intent. *See Steven H. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 566, 570, ¶ 14 (2008) (citing federal cases). We read words within the statutory context and aim to bring about the plain, logical meaning of a statute unless doing so would bring about an absurd result. *See Conroy v. Aniskoff*, 507 U.S. 511, 515–16 (1993); *Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315, 332–33 (1938); *Welch v. Cochise Cnty. Bd. of Supervisors*, 251 Ariz. 519, 523, ¶ 11 (2021). If the language is ambiguous, we consider secondary interpretive principles, such as an act's subject matter, history, and purpose, and the consequences of differing interpretations. *See Conroy*, 507 U.S. at 516–18; *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 543–44 (1940); *Welch*, 251 Ariz. at 523, ¶ 11.

**¶14** By statute, the United States Secretary of the Interior can acquire "any interest in lands, water rights, or surface rights to lands, within or without existing reservations . . . for the purpose of providing land for Indians." 25 U.S.C. § 5108. This statute further provides that "[t]itle to any lands or rights acquired . . . shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation." 25 U.S.C. § 5108.

**¶15** In *South Point II*, our supreme court determined that although § 5 of the Act "preempts state and local taxes imposed on land and rights acquired by the Secretary of the Interior and titled in the name of the United States in trust for Indian tribes or individual Indians," "[w]hen that lessee is a non-Indian, § 5 does not preempt a state or locality from taxing the improvements." 253 Ariz. at 39, ¶ 36. Thus, under the facts present here, no express authorization for preemption exists under § 5 of the Act. But express authorization is not necessarily required for preemption to apply. *See Bracker*, 448 U.S. at 144. "In the absence of express pre-emptive language, Congress' intent to pre-empt all state law in a particular area may

be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Hillsborough Cnty. v. Automated Med. Laboratories, Inc.*, 471 U.S. 707, 713 (1985) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). We will not, however, lightly presume that preemption exists. *See Washington v. Confederated Tribes of Colville Indian Rsrv.*, 447 U.S. 134, 155–56 (1980).

¶16 *Bracker* imposes a balancing test that applies when "a State asserts authority over the conduct of non-Indians engaging in activity on the reservation." 448 U.S. at 144. To determine whether a state or local tax on non-Indians doing business on the reservation is preempted, a court undertakes a "particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *Id.* at 145; *accord Dep't of Tax'n & Fin. of N.Y. v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 73 (1994) ("Resolution of conflicts of this kind does not depend on 'rigid rules' or on 'mechanical or absolute conceptions of state or tribal sovereignty,' but instead on 'a particularized inquiry . . . .'" (quoting *Bracker*, 448 U.S. at 142, 145)). In balancing these interests, "[t]he traditional notions of Indian sovereignty provide a crucial 'backdrop' against which any assertion of State authority must be assessed," as does the fact that "both the tribes and the Federal Government are firmly committed to the goal of promoting tribal self-government, a goal embodied in numerous federal statutes." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334–35 (1983) (internal citations omitted). If the state authority "interferes or is incompatible with" federal and tribal interests, the state authority will be preempted, "unless the State interests at stake are sufficient to justify the assertion of State authority." *Id.* at 334 (citations omitted).

¶17 In applying *Bracker*, courts must consider "(1) the extent of the federal and tribal regulations governing the taxed activity; (2) whether the 'economic burden' of the tax falls on the tribe or the non-Indian individual or entity; and (3) the extent of the state interest in justifying the imposition of the taxes." *Ute Mountain Ute Tribe v. Rodriguez*, 660 F.3d 1177, 1187 (10th Cir. 2011). A federal statutory scheme, agency regulations, and day-to-day agency supervision can "inform the federal and tribal interests" and "signal a federal regulatory scheme that is so pervasive that it preempts the state tax." *Seminole Tribe*, 799 F.3d at 1337 (citing *Bracker*, 448 U.S. at 145–48). Further, a tax may be impermissible when "a number of the policies underlying the federal regulatory scheme are threatened" by its application, and the taxing authority is "unable to justify the taxes except

in terms of a generalized interest in raising revenue." *Bracker*, 448 U.S. at 151.

¶18 Courts have applied the *Bracker* interest-balancing test in several circumstances involving the imposition of state or local taxes on non-Indians. *See, e.g., Yavapai–Prescott Indian Tribe v. Scott*, 117 F.3d 1107, 1111–12 (9th Cir. 1997) (ruling against preemption of state transaction privilege taxes on lodging, food, and beverage sales on tribal land); *Gila River Indian Cmty. v. Waddell*, 91 F.3d 1232, 1236, 1239 (9th Cir. 1996) (allowing transaction privilege taxes on tickets and concessionary items at a raceway and concert center on tribal land); *Salt River Pima–Maricopa Indian Cmty. v. Arizona*, 50 F.3d 734, 736, 738 (9th Cir. 1995) (holding that taxes on sales to non-Indians by a non-Indian business on Indian land were not preempted). *But see Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue of N.M.*, 458 U.S. 832, 841–43 (1982) (holding that a tax imposed on the gross receipts that a non-Indian construction company received from a tribal school board for the construction of a school for Indian children on the reservation was preempted because the Interior Department had a detailed regulatory plan for Indian schooling and the State of New Mexico had declined to take any responsibility for the education of the Indian children).

¶19 None of the aforementioned cases dealt with a property tax like the one at issue, however. In *Seminole Tribe*, an Indian tribe sued the Florida Department of Revenue executive director, challenging the imposition of a rental tax on rent paid to the tribe by non-Indian lessees for the use of commercial space at the tribe's casinos. 799 F.3d at 1326–27. The 11th Circuit Court of Appeals held that the tax was preempted, partly because it was a tax on "*a right in land*" rather than a tax on economic activity or tangible property removed from the land. *Id.* at 1331–32. In effect, *Seminole Tribe* held that the leases were so connected to the land that their taxation amounted to taxation of the land itself. *Id.* at 1329, 1331. Similarly, in *Confederated Tribes of Chehalis Reservation v. Thurston County Board of Equalization*, the Ninth Circuit Court of Appeals barred property taxes on permanent improvements on non-reservation Indian trust lands. 724 F.3d 1153, 1159 (9th Cir. 2013).

¶20 This case is distinguishable from *Seminole Tribe* and *Chehalis*. Here, the amended lease provides that the Plant and related operating equipment are owned and controlled by South Point, which must remove all above-ground real property improvements and personal property, except roads and foundations, at the expiration of the lease. And neither the land itself nor South Point's leasehold interest in the land is a factor in the tax because (1) in determining the tax, ADOR assessed only the value

of the Plant itself and the personal property used to operate it and did not assess the value of the underlying land, and (2) the amended lease provides that no partnership exists between the Tribe and South Point. Since land owned by the Tribe is exempt from state property taxes, no portion of the fee interest, including South Point's leasehold interest, is taxed.

¶21 South Point relies on United States Department of the Interior/BIA regulations—and specifically 25 C.F.R. § 162.017(a)—as support for its preemption argument. Recently, the South Dakota Supreme Court upheld an ad valorem property tax assessed by a local taxing authority on non-Indian owners of structures and permanent improvements located on Indian trust land. *See Pickerel Lake*, 953 N.W.2d at 85, ¶ 1.[5] In considering the extent of the regulations governing the taxed activity, the court rejected reliance on 25 C.F.R. § 162.017(a) as authority for implied preemption, concluding that "Congress has not authorized the BIA to preempt the State's authority to tax structures owned by non-Indians." *Pickerel Lake*, 953 N.W.2d at 92–93, ¶¶ 25–29; *see also South Point II*, 253 Ariz. at 39, ¶ 35 (holding that "the regulation itself [25 C.F.R. § 162.017(a)] cannot preempt the County's tax" and "we have no need to defer to the Department of Interior's interpretation" (citations omitted)). The *Pickerel Lake* court further concluded that any preemptive language in the federal regulations should have no impact on its analysis and found "little evidence of congressional intent to supersede the State's authority." 953 N.W.2d at 93, ¶ 30 (citing *Wyeth v. Levine*, 555 U.S. 555, 576 (2009)); *see also South Point II*, 253 Ariz. at 39, ¶ 35 ("The Department of Interior has taken the position in other cases that '§ 162.017 has no legal effect at all,' and . . . is 'agnostic' on whether any specific state tax is preempted." (citing *Desert Water Agency v. U.S. Dep't of the Interior*, 849 F.3d 1250, 1254–55 (9th Cir. 2017) (adopting the view that the phrase "[s]ubject only to applicable Federal law" in the regulation means subject to a *Bracker* analysis))).

¶22 The court also reasoned that although the federal government retains exclusive power to regulate Indian affairs, it "has asserted little to no regulatory power in the area of state-imposed ad valorem taxes on structures owned by non-Indians," and "[i]t is generally within the

---

[5] The court applied what it deemed a "standard preemption analysis" rather than a *Bracker* analysis after noting (1) the parties agreed *Bracker* did not apply, (2) the Tribe had not intervened, and (3) the record contained no evidence that (a) tribal interests weighed against the county's taxation authority with respect to non-Indian lessees, (b) the county's separate ad valorem tax affected the Tribe's ability to lease the land, or (c) the taxes had otherwise impacted tribal interests. *Pickerel Lake*, 953 N.W.2d at 88, ¶ 12.

province of the State to assess property taxes." *Pickerel Lake*, 953 N.W.2d at 94, ¶ 31 (citations omitted). The court noted that courts "presume that 'Congress does not intend to pre-empt areas of traditional state regulation,'" and "assume the State retains its historic power to regulate by imposing state and local taxes." *Id.* (citations omitted). Finally, in concluding that implied preemption did not apply, the *Pickerel Lake* court held: "Because there is little or no federal regulatory scheme in place with respect to property taxes, and because the State's taxation does not implicate Indians or their tribes, thereby implicating federal law, the State's assessment of nondiscriminatory ad valorem property taxes against structures owned exclusively by non-Indians [on Indian trust land] is not [impliedly] preempted by federal law." *Id.* at ¶ 32. *See also N. Border Pipeline Co. v. State*, 772 P.2d 829, 835 (Mont. 1989) (upholding a state property tax on a pipeline crossing tribal land); *Thomas v. Gay*, 169 U.S. 264, 273–74 (1898) (holding that Oklahoma could tax cattle owned by non-Indian lessees of Indian land and rejecting the suggestion that the tax constituted a tax on the land); *Utah & N. Ry. Co. v. Fisher*, 116 U.S. 28, 29–30, 33 (1885) (upholding a territorial tax of a section of a non-Indian's railroad that crossed onto reservation land, reasoning that the tax did not interfere with tribal sovereignty).[6]

**¶23**　　　　The truisms relied on by the *Pickerel Lake* court apply here as well, and South Point points to nothing about the federal regulation of power plants that is more extensive or intensive when a plant is on tribal land or how a particularized inquiry into the nature of the federal, tribal, and state interests at stake leads to the conclusion that the tax is preempted. *See generally Ute Mountain Ute Tribe*, 660 F.3d at 1187. As the tax court noted, the pervasiveness of federal regulation of tribal leases is immaterial because no aspect of the lease is subject to tax, and federal regulation of power plants applies to all power plants regardless of their location; thus, if state or local taxation of power plants on reservations is preempted, state taxation on every other power plant would also be preempted.

**¶24**　　　　As for whether the economic burden of the County's property tax falls on the non-Indian entity (South Point) or the Tribe, *see id.*, it is clear the tax is being levied on the Plant and related improvements, all of which are wholly and separately owned by South Point, and not on the land, which the Tribe owns, and that no partnership exists between South Point

---

[6] *Bracker* cited both *Thomas* and *Fisher* but did not overrule either case. *See* 448 U.S. at 142, 145; *see also Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 472 (2d Cir. 2013) (concluding that "*Thomas* [and other pre-*Bracker* non-Indian lessee cases] inform[]" but do not forgo a *Bracker* analysis).

and the Tribe. Thus, South Point is the actual taxpayer and bears the tax's legal incidence. *See Circle K Stores, Inc. v. Apache Cnty.*, 199 Ariz. 402, 407, ¶ 13 (App. 2001). Moreover, the United States Supreme Court has rejected the argument that when the federal government's or a tribe's interest in economic development on reservations—and the associated profitability that comes with that interest—might be indirectly affected, that indirect burden supports granting non-Indian contractors immunity from state or local taxation:

> It is, of course, reasonable to infer that the existence of the state tax imposes some limit on the profitability of Indian oil and gas leases—just as it no doubt imposes a limit on the profitability of off-reservation leasing arrangements—but that is precisely the same indirect burden that we rejected as a basis for granting non-Indian contractors an immunity from state taxation in *Helvering v. Mountain Producers Corp.*, 303 U.S. 376 (1938); *Oklahoma Tax Comm'n v. United States*, 319 U.S. 598 (1943); *Oklahoma Tax Comm'n v. Texas Co.*, 336 U.S. 342 (1949); *Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation*, 425 U.S. 463 (1976); and *Colville*, 447 U.S. at 134.

*Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 191 (1989) (citations cleaned up); *accord Waddell*, 91 F.3d at 1239 (concluding that indirect economic effects, including those flowing from double taxation, were insufficient grounds to preempt a state tax). As the Supreme Court previously stated in *Colville*, "We do not believe that principles of federal Indian law, whether stated in terms of pre-emption, tribal self-government, or otherwise, authorize Indian tribes thus to market an exemption from state taxation to persons who would normally do their business elsewhere." 447 U.S. at 155.

¶25        Moreover, no salient argument exists that should the property tax not be paid, the State could impose a tax lien on the underlying real property, thereby damaging the Tribe. We cannot see how a tax lien could be imposed on land exempt from taxation, and A.R.S. § 42-17153 provides that "a tax that is levied on real or personal property is *a lien on the assessed property*." (Emphasis added.) Under the amended lease, South Point's property never becomes part of the land, so the Tribe's land is not part of the assessed property.

¶26        Finally, as to the extent of the state interest in justifying the imposition of the taxes, *see Ute Mountain Ute Tribe*, 660 F.3d at 1187, we conclude that although South Point demands few direct services from the

state or Mohave County, there has also been no complete declination of responsibility for services as found to exist in *Ramah Navajo School Board*, *see* 458 U.S. at 843–45, *cited in Cotton Petroleum*, 490 U.S. at 184–87. As the *Cotton Petroleum* court recognized, there is no "proportionality requirement" imposed on the taxing authority, and preemption should occur only when there has been a "complete abdication or noninvolvement" by the state or County. 490 U.S. at 185.

¶27 Here, the tax revenue supports local services that help South Point, its employees, and the Tribe, including "services on the reservation" and "services off the reservation that benefit the reservation and members of the Tribe." *See id.* at 171 n.7, 185 (relying on the trial court's factual findings to distinguish the case from *Bracker* and *Ramah Navajo School Board*). For example, the tax revenue supports the local school districts, and both tribal-member children and children of South Point non-Indian employees attend schools in these districts. *See N. Border Pipeline*, 772 P.2d at 835 (finding no preemption because "the State's interest in funding the school districts involved here and providing local services outweighs the federal/tribal interests asserted"). Additionally, the tax helps Mohave County maintain roads that provide important and commonly used access to the Plant. Revenue from the tax also supports numerous other state and County services—some of which aid the reservation—including flood control, law enforcement and emergency planning, local fire districts, libraries, the County Recorder, and the Arizona Corporation Commission's oversight and inspection of the pipelines used to fuel the Plant. A substantial state interest exists justifying the imposition of the taxes, and the funding of these numerous services militates against finding an implied preemption of the County's tax. Accordingly, application of the interest-balancing test announced in *Bracker* does not establish Congress's implicit intent to preempt taxing the Plant.

## CONCLUSION

¶28 We affirm the tax court, which correctly ruled that the Plant is not impliedly exempt from the County's tax under *Bracker*.

